**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Arthur BURRELL, Defendant-Appellant.**

**No. 73-3826.**

United States Court of Appeals, Fifth Circuit.

Dec. 30, 1974.

Neal Sonnett, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Chief, App. Section, Charles E. Brookhart, Tax Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before TUTTLE, THORNBERRY and SIMPSON, Circuit Judges.

TUTTLE, Circuit Judge:

Arthur Burrell was convicted by a jury of knowingly filing false income tax returns in 1967 and 1968 in violation of 26 U.S.C. § 7206(1) [1] and of attempted income tax evasion for 1968 in violation of 26 U.S.C. § 7201. [2] He was sentenced to concurrent terms of six months to be served in a jail-type institution followed by three years probation. The defendant appeals, raising four issues. We affirm.

I.

Two of defendant's four points on appeal relate solely to his 1967 conviction. The Government urges us to bypass consideration of these issues as Burrell received concurrent sentences on all three convictions. We feel we must decline the invitation.

 The concurrent sentence doctrine is one of "judicial convenience," Benton v. Maryland, 395 U.S. 784, 791, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969);

United States v. Varner, 437 F.2d 1195 (5th Cir. 1971) ; United States v. Bigham, 421 F.2d 1344 (5th Cir. 1970), and does not pose a jurisdictional bar to consideration of any of the issues the defendant raises, Benton v. Maryland, *supra*. It is a matter of discretion whether to withhold full appellate review of a conviction the outcome of which could not affect the defendant's penal interest. Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943) ; United States v. Johnson, 496 F.2d 1131 (5th Cir. 1974).

Here we believe it is important to review all three of the counts for which the defendant was convicted, despite the fact that we affirm each of them. The crimes of tax evasion and filing a false income tax return involve delicate questions of intent; while the defendant's § 7201 conviction of tax evasion involves a jury finding of specific intent to avoid taxes, his two § 7206(1) convictions of knowingly filing false income tax returns also require a finding of scienter. Particularly in § 7201 cases, we have frequently held the trier of fact may properly rely on a pattern of understatement of income in previous years to infer the requisite specific intent of tax evasion. *See, e. g.,* Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1954) ; United States v. Tunnell, 481 F.2d 149 (5th Cir. 1973) ; Holbrook v. United States, 216 F.2d 238 (5th Cir. 1954), cert. denied, 349 U.S. 915, 75 S.Ct. 605, 99 L.Ed. 1249 (1955). Thus in this case, Burrell's 1968 tax evasion conviction may very directly have been affected by the jury's finding

---

[1]. 26 U.S.C. § 7206(1) provides:
Any person who—
(1) *Declaration under penalties of perjury.*—Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ; or
. . . . .
shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than

3 years, or both, together with the costs of prosecution.

[2]. 26 U.S.C. § 7201 provides:
*Attempt to evade or defeat tax.*
Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

of understatement of income in 1967, a finding the defendant challenges as being based on improper evidence.

## II.

Burrell's 1967 return was found by the jury to be false in that it failed to report as income a $34,400.05 check which Burrell received from his employer, Hirsch and Co., in December, 1967. The fact that Burrell received this check is undisputed. Rather the defendant claims the check wasn't taxable income because it was in effect a loan.

Burrell was the office manager for the Miami office of Hirsch and Co., a stock brokerage firm. He had margin accounts established with his employer which he used for his own stock transactions. It was his practice to occasionally request that checks be drawn against his margin accounts to prepay a commission he was expecting within the next few days on a sale he had effected. These checks were drawn out of sequence on the firm's check blotter, to attempt roughly to predict at what point the normal commission would be paid. Thus here, Hirsch and Co. check No. 54944 was drawn on December 1, 1967 but the checks immediately preceding it on the blotter weren't drawn until January, 1968, and it wasn't until that time that the check in question was discovered by Hirsch and Co. to have been written.

How check No. 54944 came to be written is still uncertain. Burrell testified he had no recollection of it. Both Burrell's assistant manager and his head cashier testified they did not remember writing such a check—this despite the defendant's statement that he assumed the cashier must have drawn it. Burrell was shown to be one of only four individuals with access to the check blotter who could have written the check. In any event, once the check was discovered in January, several weeks after Burrell had been discharged by Hirsch and Co., the complany demanded repayment. After seven months of negotiations Burrell repaid the $34,400.05 in July, after the company made the formal statement that it was prepared to accept Burrell's assertion that it must have been drawn inadvertently.

■■ The question presented to the jury was whether this $34,400.05 was money Burrell embezzled from his employer, or whether it was simply an inadvertent advance on the defendant's margin account which was meant to be repaid. The jury found it to be taxable income, and thus inferentially must have found it to be embezzled. Money misappropriated from one's employer is taxable, James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); Nordstrom v. United States, 360 F.2d 734 (8th Cir. 1966). We believe the jury's finding was a permissible one in light of all the evidence.

■ The evidence must be taken in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Warner, 441 F.2d 821 (5th Cir. 1971), cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971) and after reviewing the record we do not conclude that a "reasonably minded jury" aware of all the facts in the record, "*must* have a reasonable doubt" of the defendant's intention to misappropriate the funds, United States v. Stephenson, 474 F.2d 1353, 1355 (5th Cir. 1973).

The Government proved the normal procedure employed by Burrell in the past when he wished an advance payment on expected commissions was to have his cashier draw the check out of sequence by a *few days* and credit that amount against his margin account. Burrell claimed that was all that happened in this case—but the Government proved Burrell's cashier had no knowledge of the check, that it was drawn not a few days out of sequence but *more than a month*, and that further it was immediately cashed by Burrell and used to cover a previous check for $34,400.00 which he had received in November. The December check was shown to be used to cover the bulk of this earlier ad-

vance, inasmuch as Burrell's checking account was substantially overdrawn. The balance over the amount his margin account was in arrears was used to cover a part of the overdrawn checking account. Thus, despite Burrell's claim that he had been completely unaware that the December 1 check had even been issued to him, the Government proved it was used immediately to cover past debts which Burrell apparently would have been unable to pay. Despite Burrell's further claim that he was so active in trading on his own account that he was oblivious to checks being drawn (for as he testified he was very active in the market, buying and selling $687,277 worth of securities in November, 1967 and $428,958 in December, 1967), he was shown to have been suffering huge losses in the market—and had a capital loss carryforward of over $170,000 in 1968. We believe the jury could properly find, beyond a reasonable doubt, that the $34,400.05 check was not merely an inadvertent advance on a loan account, but represented Burrell's intentional misappropriation of his employer's funds for his own use and thus was taxable income to him.

The defendant challenges the method by which the Government proved its case of embezzlement. First the defendant argues Government's Exhibit 35 was improperly admitted into evidence; second the defendant argues a statement made by one of the Government's witnesses was prejudicial and reversible error.

■ Exhibit 35 was an investigatory report compiled by an accounting firm engaged by Hirsch and Co. to audit Burrell's accounts following his discharge. The report by its own terms is a summary of findings, encompassing both conclusory impressions of the accountant who performed the audit as well as selected portions of Hirsch and Co. records. This report was admitted into evidence as a business record, 28 U.S.C. § 1732.[3]

The Government contends United States v. DeFrisco, 441 F.2d 137 (5th Cir. 1971) is authority for the admissibility of such a report. We disagree.

In *DeFrisco* a credit report was held to be admissible in a prosecution against DeFrisco's employer for giving false credit information and thereby assisting DeFrisco in misrepresenting his income to the Federal Housing Administration. As part of the FHA's investigation of DeFrisco it engaged a commercial credit reporting agency which inquired what DeFrisco's annual salary was from his employer. This investigation was done in the credit reporting agency's normal course of business, and the results of its inquiry were recorded within the time required by 28 U.S.C. § 1732. In *DeFrisco* the credit reporting agency's inquiry was itself a transaction of crucial importance to the case, and thus its report was "a memorandum or record" of an "act, transaction, occurrence or event" which was at issue in the case. As we said in *DeFrisco*:

"The purpose of the federal Business Records Act is to dispense with the necessity of proving each and every book entry by the person actually making it. The theory underlying the Act is that business records in the form regularly kept by the particular company and relied on by that company in the ordinary course of its business have a certain probability of trustworthiness. . . . Therefore, 'so long as regard is paid to the indispensable fundamental trustworthiness

3. 28 U.S.C. § 1732 provides:
 In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event, or within a reasonable time thereafter.

of the proffered record, the statute' . . . should of course be liberally interpreted so as to do away with the anachronistic rules which gave rise to its need and at which it was aimed." 441 F.2d at 139–140. These standards were not met in this case.

Exhibit 35 was a summary of Hirsch and Co.'s records of Burrell's margin accounts. It was not a record of any act, for the fact that an audit was performed was not of significance to the case, for were it to be argued it constituted a "record" of Burrell's dealings in his margin account it would obviously have been recorded long after the conduct at issue occurred, and thus fall outside § 1732 for that reason. Further the auditor's impressions and conclusions are not in our view vested with the type of indicia of reliability which complies with the policies of the Federal Business Records Act.

■ Despite its inadmissibility, however, we must hold that the admission of Exhibit 35 was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, (1967); United States v. Resnick, 483 F.2d 354 (5th Cir. 1973), cert. denied, 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973). The information it contained was wholly cumulative; the fact that the check was issued was undisputed, indeed the check itself was admitted into evidence. The fact that Burrell occasionally took checks out of sequence to prepay commissions was shown by both the Hirsch and Co. records admitted into evidence and by the testimony of the cashier. The fact that Burrell used the check to pay another margin account in arrears was shown by the Hirsch and Co. records and the records of Burrell's bank. The fact that Burrell's checking account was substantially overdrawn was shown by the records of the bank and not even mentioned in Exhibit 35. If anything, these facts were shown far more clearly in the other exhibits and testimony, for Exhibit 35 was a technical report couched in technical accounting terminology.

The sole ground offered by the defendant to show Exhibit 35's prejudicial effect was the fact that it was referred to by the U. S. Attorney in closing argument. We cannot attach the same significance to the reference as the defendant argues—for despite the fact the U. S. Attorney did refer to Exhibit 35 as showing the facts we have just discussed, in his argument the U. S. Attorney himself stated that all of those facts were proven in one or more other ways as well. The defendant does not cite any fact which Exhibit 35 documents which is not in evidence elsewhere as well. We can perceive no prejudice which the defendant suffered through the erroneous admission of Exhibit 35, and thus do not feel it warrants reversal.

■ The defendant also attacks the statement of Special Agent Wanderscheid that the defendant "embezzled" the $34,400.05. The defendant points to the fact that this reference to the defendant's "embezzlement" was the first time the word was used by any witness. The full statement of Agent Wanderscheid was that this check was money "Mr. Burrell received, or took or embezzled from Hirsch and Company," and the trial court sustained defense's objection to the use of the term "embezzlement" and instructed the jury to disregard the witness' characterization of the receipt of the check as "embezzlement." Essentially what the defendant argues is the sufficiency of the evidence on the point, not the use of the conclusory phrase of Agent Wanderscheid—and as we have previously said, we feel the evidence was sufficient to permit the jury to find embezzlement and not an innocent and inadvertent receipt of a check erroneously drawn in Burrell's favor by the cashier. We do not believe the use of the term "embezzlement" by the witness constituted reversible error.

### III.

The defendant raises two issues concerning his §§ 7201 and 7206(1) convictions arising out of his 1968 tax return.

The jury found he understated his income in 1968 by over $100,000 primarily due to his failure to report income arising out of two separate sets of transactions concerning a corporation called Meter Maid Industries, Inc.

Burrell assisted in a merger between North American Cigarette Manufacturing Co. and Meter Maid Laundries, Inc. which took the form of a stock for stock exchange, whereby North American acquired control of Meter Maid Laundries and renamed itself Meter Maid Industries. For his role in facilitating this transaction Burrell received 600,000 restricted common shares of North American on February 20, 1968—eventually returning 400,000 of these shares but retaining 200,000 shares for his own use. He disposed of these shares by pledging them as security for a loan he had previously obtained, and the pledgee exchanged them for shares of Meter Maid Industries, Inc. in July, 1968. Burrell reported no income on this transaction. The Government's expert witness on securities valuation, John O'Farrell, placed a value of $27,500 on these 200,000 shares as of February 20, 1968.

Following the reincorporation of North American as Meter Maid Industries, Burrell engaged in a protracted and successful effort to sell shares in the new corporation. Between February and September of 1968 he sold $73,029.-30 worth of restricted and unrestricted common shares of Meter Maid Industries which he reported as long-term or short-term capital gains. Due to his large capital loss carryforward from previous years,[4] were these proceeds to constitute capital gains Burrell would have owed no tax. In fact, as the jury found, he was not authorized to sell the shares of Meter Maid Industries which he sold and thus they did not constitute capital assets and the proceeds on the sales should have been reported as ordinary income.

■ Burrell first challenges the method by which O'Farrell valued the North American shares he received. Despite the fact the defendant poses this issue as one involving the use of hearsay records in violation of our *en banc* decision in United States v. Williams, 447 F.2d 1285 (5th Cir. 1971), actually the only serious issue raised concerns the completeness of the information the expert relied upon, rather than its hearsay components. *Williams* held that "an expert's testimony need not be based solely upon records which are themselves introduced in evidence so long as the sources of information are of the type reasonably relied on by experts in forming opinions or inferences upon the subject." 447 F.2d at 1291. The defendant attempts to make the argument that O'Farrell's use of the so-called "pink sheets" quotations of over-the-counter bids on unlisted securities fell outside the *Williams* rule. We find this argument invalid. O'Farrell was an expert of long experience, whose expertise was unchallenged by the defense; he explained what "pink sheets" were, and their use in the securities industry—as indeed Burrell did himself—and we do not believe any serious question can be raised that over-the-counter bids for North American shares prior to February 20, 1968 can be said to fall outside the rule established in *Williams*.

■ Rather the defendant actually repeats the attacks first raised in cross-examination of O'Farrell concerning his failure to examine North American's assets in addition to researching the stock's market history and recent trading prices. Admittedly North American was a shell corporation without assets at the time of the merger with Meter Maid Laundries, but O'Farrell explained the market price for a security isn't necessarily related to the asset value of the corporation, and he testified he studied the market performance of North American prior to the Meter Maid Laundries merger, and thereafter, and his valuation of $0.13¾ per restricted share was based on the then-existing market for

---

4. 26 U.S.C. § 1212(b) provides for this capital loss carryover.

the shares. The defendant's criticisms of O'Farrell's failure to make a precise estimate of North American's assets went to the weight of his testimony, not its admissibility.

We should further note Burrell's counter testimony that the shares he received had no value whatever seemed to contrast starkly with his admitted ability to sell Meter Maid Industries shares shortly thereafter, at prices well above $0.-13¾ per share, despite the fact Meter Maid Industries experienced *no sudden increase in its assets.*[5]

We believe the jury was entitled to accept O'Farrell's estimate of value.

Finally the defendant argues the Government failed to sustain its burden to prove the understatement of income in 1968 was more than mere understatement and amounted to tax evasion as required for a conviction under 26 U.S.C. § 7201.

■ The Government clearly must prove that the defendant acted *willfully in attempting to evade the payment of taxes* in 1968. Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L. Ed. 418 (1943); *see, also,* United States v. Bishop, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973). It must be shown that the defendant not only understated his income but committed some overt act or acts as part of his attempt to evade or defeat the tax. Such affirmative acts of evasion such as concealment of financial transactions and the providing of false or incomplete information in an attempt to hamper the investigation have been held to constitute sufficient evidence to permit the trier of fact to infer the specific intent to evade taxes. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.

Ed. 150 (1954); United States v. Stone, 431 F.2d 1286 (5th Cir. 1970), cert. denied, 401 U.S. 912, 91 S.Ct. 879, 27 L. Ed.2d 811 (1971); Windisch v. United States, 295 F.2d 531 (5th Cir. 1961); McGrew v. United States, 222 F.2d 458 (5th Cir. 1955). A consistent pattern of understatement has been held to present a jury question as to willfulness, United States v. Tunnell, 481 F.2d 149 (5th Cir. 1973); Holland v. United States, *supra*, as had the failure to report a very substantial amount of income, United States v. Schechter, 475 F.2d 1099 (5th Cir. 1973); Wardlaw v. United States, 203 F.2d 884 (5th Cir. 1953). Finally making false statements to Treasury agents has been held to constitute the type of affirmative act of evasion necessary to permit a § 7201 conviction. United States v. Beacon Brass Co., 344 U.S. 43, 73 S.Ct. 77, 97 L.Ed. 61 (1952); United States v. Newman, 468 F.2d 791 (5th Cir. 1972).

■ The defendant argues the record fails to disclose the types of clandestine financial dealings which the Supreme Court in *Spies, supra,* described as examples of the type of overt act necessary to justify a conviction under the earlier version of § 7201—such as double bookkeeping, false entries, false documents, and the like—but in *Spies* the Supreme Court carefully noted its examples were intended to illustrate the type of conduct required, but not limit the list of overt acts to those described. Burrell did not attempt to maintain secret records or deal under false names, but neither was he completely candid with the investigators of the Internal Revenue Service—originally maintaining he made no sales of Meter Maid Industries stock and later supplying a less than complete listing of the transactions

---

5. For example, the record shows seventeen specific transactions effected by Burrell between February and September of 1968, involving both restricted and unrestricted common shares of Meter Maid Industries, in which he sold 100,000 shares for $50,360. Given this background, it is difficult to credit his testimony that the 200,000 shares he received were worth absolutely nothing, and

that he told the bank which requested the stock (he refused on cross-examination to acknowledge that the stock thus was collateral for the loan, asserting he couldn't understand what purpose the bank could have for requesting it) that he felt it was so worthless "you can paper your walls with it maybe sometime. . . . "

he did complete. Further his understatement of income was more than a "mere understatement" of income, it was a substantial understatement—increasing his tax liability from zero as originally reported to $27,959.14. Given these facts, as we have held before, "[t]he appellant can point, as defendants have done in many similar cases, to the lack of certain badges of fraud. That is not enough. The question of wilfulness is for the jury." Windisch v. United States, 295 F.2d 531, 532 (5th Cir. 1961). We find ample evidence to sustain the jury's findings of willful intent to evade taxes.

Accordingly, we affirm the judgment of the trial court.