UNITED STATES of America,
Plaintiff-Appellee,

v.

James Hall FENDLEY,
Defendant-Appellant.

No. 74-3976.

United States Court of Appeals,
Fifth Circuit.

Oct. 9, 1975.

Rehearing Denied Nov. 14, 1975.

James L. Martin, Richardson, Tex., for defendant-appellant.

Frank D. McCown, U. S. Atty., Ft. Worth, Tex., William F. Sanderson, Jr., Richard H. Stephens, Roger J. Allen, Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.

TUTTLE, Circuit Judge:

James Hall Fendley was convicted by a jury of tax evasion and filing a false tax return in 1967 in violation of §§ 7201 and 7206(1) of the Internal Revenue Code, 26 U.S.C. § 7201, 7206(1). The defendant appeals.

Fendley was found by the jury to have embezzled large sums from his employer, the National Western Life Insurance Company. Fendley failed to report any of the monies which he was found to have embezzled, and this essentially is the basis for his conviction. The defendant does not dispute the rule that money misappropriated from one's employer is taxable as ordinary income, *James v. United States*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); *United States v. Burrell*, 505 F.2d 904 (5th Cir. 1974); rather the defendant attacks both the sufficiency of the evidence as well as certain specific business records admitted into evidence. We find the defendant's claims to be meritless, and accordingly we affirm his conviction.

Fendley was found by the jury to have devised a scheme whereby he and certain of his employees fraudulently induced Western Life Insurance Company to pay them commissions on sham policies of insurance. Fendley's scheme was based on Western Life's practice of paying advance commissions against future premiums to new agents during their first year of employment. When the company received an application for insurance with a first month's premium, it would pay the sales agent an advance of four and one-half times the premium, up to a maximum of $750.00 per month. Fendley would induce someone to purchase a policy by paying him the amount of the first month's premium; after forwarding the policy to the home office Fendley would then persuade the purchaser to cancel the policy. Thus he would receive commissions against premiums which would never be paid. To avoid the $750 ceiling, Fendley used a number of names other than his own as pretended agents. The 622 policies shown to have been shams produced commission advances of over $179,000 which were in essence unearned. Fendley was shown to have personally endorsed commission checks, made payable to him and to some 49 other agents, totalling $80,648.41.

The defendant first complains that the Government failed to adequately prove that he had in fact endorsed the 202 checks admitted into evidence against him. The defendant does not, however, challenge the expertise of the Government's expert witness who identified the

signatures on each check as having been written by Fendley—rather the defendant repeats the attacks first raised in cross-examination of the Government's handwriting expert as to the method by which he arrived at his opinion. The defendant's criticisms of the expert's method of comparing handwriting samples go solely to the weight of his testimony, not its admissibility, and in our view the jury was entitled to accept the expert's opinion.

■ The defendant argues that there was insufficient evidence for the jury to find that he wilfully embezzled funds from his employer, rather he claims that the commission advances were merely loans. After carefully reviewing the record, we have no doubt that this jury was fully justified in finding that Fendley wilfully embezzled the funds, and that there was no evidence whatever of any intention to repay them. Fendley received huge amounts of unearned commissions and banked them without any effort to return them to Western Life; Fendley was shown to have submitted sham policies in the names of non-existent agents in order to increase the amount of commissions he could obtain from Western Life; finally, the record shows that when Western Life attempted to investigate the business practices of the Fendley agency, Fendley attempted to persuade his employees to refuse to talk to company investigators. All these circumstances convincingly establish that Fendley misappropriated his employer's funds for his own use, and that accordingly these funds were properly taxable to him. *See United States v. Burrell, supra.*

The defendant also complains of three specific sets of records introduced against him at trial. All three sets of records were admitted under the Federal Business Records Act, 28 U.S.C. § 1732.

"Business records are admissible in federal courts as evidence of a transaction or occurrence if made in the regular course of business and if it was the regular course of business to make such records within a reasonable time of the transaction or occurrence." *United States v. DeFrisco,* 441 F.2d 137, 139 (5th Cir. 1971). This Court has frequently had occasion to review the admissibility of business records under the Business Records Statute:

"The purpose of the federal Business Records Act is to dispense with the necessity of proving each and every book entry by the person actually making it. The theory underlying the Act is that business records in the form regularly kept by the company and relied on by that company in the ordinary course of its business have a certain probability of trustworthiness."

*Louisville and Nashville Railroad Co. v. Know Homes Corp.,* 343 F.2d 887, 896 (5th Cir. 1965); *United States v. DeFrisco, supra,* 441 F.2d at 139.

■ The trial court has a broad zone of discretion in determining the admissibility of business records, and normally its ruling should be disturbed only when that discretion has been abused. *United States v. Middlebrooks,* 431 F.2d 299, 302 (5th Cir. 1970), *cert. denied,* 400 U.S. 1009, 91 S.Ct. 56, 27 L.Ed.2d 622 (1971). In recently reviewing the standards for admissibility under the Business Records Act we concluded that the statute's primary purpose was to "provide a check on trustworthiness" and that business records are admissible if three conditions are met:

"(1) The records must be kept pursuant to some routine *procedure* designed to assure their accuracy, (2) they must be created for *motives* that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and (3) they must not themselves be mere accumulations of hearsay or uninformed opinion."

*United States v. Miller,* 500 F.2d 751, 754 (5th Cir. 1974).

■ The defendant objects to the admission of Government Exhibits 4–1 and 4–2 solely on the basis that the custodial witness who laid the foundation for the introduction of these exhibits

was not himself in the employ of the company making the records at the time they were made. A witness laying the foundation for admissibility of a document as a business record need not have been the preparer of the document, *United States v. Gremillion*, 464 F.2d 901, 906 (5th Cir. 1972)—for indeed this Court stated that:

> "Section 1732 was adopted in part to eliminate the requirement that the entrant appear to authenticate the record."

*United States v. Miller, supra*, 500 F.2d at 754.

"[T]he person who actually keeps the books and records and makes the entries need not testify if a person does testify who is in a position to attest to the authenticity of the records." *United States v. Dawson*, 400 F.2d 194, 199 (2d Cir. 1968). These criteria were met in this case, and we find the exhibits to have been properly admitted.

Finally, the defendant objects to the introduction of Government Exhibit 9–108, a computer printout introduced as a business record of the Western Life Insurance Company. This printout showed the credit balances of each of the agents in the Fendley agency, and showed the aggregate total of $179,084.41 as being owed by the Fendley agency for unearned commission advances.

▆▆▆ The defendant objected at trial to the introduction of this exhibit on these grounds:

> "Then, Your Honor, we will renew our objection to Government's Exhibit 9–108–B (sic) on the basis that there is no accuracy shown that the instrument is accurate as to the figures it reflects;
>
> And that the preparer was someone other than the witness here; that we cannot determine the accuracy of it, and therefore, it shouldn't be admitted;
>
> Because it would be hearsay and, again, I cannot cross-examine the paper, obviously, without having the par-

ty assigned to compiling the figures on it before us.

> We object on that basis."

It appears to us that this loosely formulated and imprecise objection at most comes to this: (1) that the document was hearsay; (2) that the witness laying the foundation for its introduction was someone other than the preparer; and (3) that the witness laying the foundation was unable to personally attest to the accuracy of the figures contained in the document. There was no objection on the only grounds which would have permitted the trial court to have required that a fuller foundation be laid for the admission of the exhibit—that the printout was made and kept in the regular course of business, for regular business purposes and relied upon by the business, and finally that it was not "mere accumulations of hearsay or uninformed opinion." *United States v. Miller, supra*, 500 F.2d at 754.

The grounds asserted in the defendant's objection are clearly insubstantial. While obviously the document was hearsay, this in itself fails to state an objection as to whether the exhibit met the admissibility requirements of the Business Records Act. Similarly, nothing in the Business Records Act requires either that the foundation witness be able to personally attest to the accuracy of the information contained in the document, or that he have personally prepared the document. In fact, both these requirements have been frequently held to have been specifically eliminated by 28 U.S.C. § 1732. *See United States v. Miller, supra; United States v. Gremillion, supra; United States v. DeFrisco, supra*.

▆▆▆ The defendant now on appeal raises new grounds as a basis for objecting to the admissibility of Exhibit 9–108. In our view the defendant is foreclosed from making these objections at this time, as he failed to comply with the requirements of Rule 51, Federal Rules of Criminal Procedure, that he make "known to the [trial] court the action which he desires the court to take or his

objection to the action of the court and the grounds therefor." Clearly if the defendant fails to object to the admission of evidence, objection is normally waived, *United States v. Maddox*, 492 F.2d 104 (5th Cir. 1974) unless the admission of such evidence is such clear error that it affects substantial rights. *See United States v. Davis*, 496 F.2d 1026 (5th Cir. 1974); *Sykes v. United States*, 373 F.2d 607 (5th Cir. 1966). Here, although the defendant objected in general terms on the three grounds of hearsay, authorship and accuracy, he failed to object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection—if in fact he wished to object to the lack of a proper foundation under the business records statute.[1] *United States v. Bryant*, 480 F.2d 785, 792 (2d Cir. 1973).

Here the adherence to the requirements of Rule 51 is peculiarly required. Questioning the same witness who introduced 9–108 the Government had already meticulously and properly laid the foundation for the introduction of more than 100 documentary exhibits under the Business Records Act. Had the defendant properly objected that the Government had failed to observe the same care in introducing 9–108, the court could then have permitted the Government to lay the proper foundation if the printout was in fact kept in the ordinary course of business and relied upon by the business. Instead when the Government negligently failed to ask the proper sequence of foundation questions concerning 9–108, no objection was raised which would have alerted the court or the Government counsel to this mistake. The defendant now proposes this as grounds for reversing his conviction—

but does not argue that the admission of 9–108 was clear error, only that the foundation laid was inadequate and that such computerized evidence is unreliable.

■ It is true that the Government failed to completely lay a proper foundation for the admission of the exhibit. This may well have resulted from the fact that there was a lengthy *voir dire* concerning the witness' knowledge of the preparer and the accuracy of the exhibit, both irrelevant to the issue of admissibility. Despite our concern that the Government failed to fully justify the admission of 9–108 under the business records exception to the hearsay rule, we do not believe this is grounds for reversal. Even otherwise inadmissible hearsay does not provide grounds for reversal if proper objection isn't made, or if it doesn't constitute clear error.

■ The defendant does not now claim that the introduction of 9–108 was clear error; in this we agree. The sole question then becomes whether the cluster of objections made at trial to the introduction of the exhibit preserve the point for appeal.[2]

■ As we have said, we do not find in the general objections made at trial any reference to the three-fold requirements set out in *United States v. Miller* for compliance with the foundation requirements of the Business Records Act; nor do we find in these objections any reference to the reliability of the method of preparation. To object as the defendant did that "the preparer is someone other than the witness here" and that consequently "there is no accuracy shown that the instrument is accurate as to the figures it reflects" in no way apprises the trial court that the defendant

---

1. We doubt whether the imprecise objections made were intended to object to the foundation laid; we note that during the introduction of Exhibits 4–1 and 4–2, *the foundation for which was properly laid*, the defendant objected only on the same grounds on which he later objected to 9–108, that the witness wasn't the preparer and he could not vouch for the document's accuracy. It is difficult to account for

the defendant's having objected in the same terms to the prior introduction of exhibits which had been properly introduced unless the grounds stated were the only grounds the defendant then relied upon.

2. We note that even were the point preserved for appeal, the introduction of the exhibit could still constitute harmless error.

attacks the reliability of the method of preparation of the exhibit.

■ The defendant has persisted in his belief that he has a right to cross-examine the preparer of each document introduced into evidence against him; despite the clear caselaw in this Circuit to the contrary, the defendant has objected to Exhibits 4–1, 4–2 and 9–108 at trial and on appeal on the narrow grounds that the actual entrant of the numbers contained in each exhibit did not testify and thus the exhibits were inadmissible. There is no latent ambiguity in these objections—by which more precise and correct objections can be distilled—the defendant objected that the preparer of each document wasn't in court, not that computerized evidence is unreliable or that an inadequate foundation had been laid. Yet our cases make it clear that the defendant could not successfully object to the admissions of the documents on this basis.

■ The use of similar computer printouts has been upheld in criminal prosecutions. *United States v. Russo,* 480 F.2d 1228 (6th Cir. 1973); *United States v. De Georgia,* 420 F.2d 889 (9th Cir. 1969). In *Olympic Insurance Co. v. H. D. Harrison, Inc.,* 418 F.2d 669 (5th Cir. 1969) we held that such a computer printout was not intrinsically unreliable, and that such a printout was admissible as a business record under 28 U.S.C. § 1732.[3]

■ Of course we agree that should a defendant wish to attack the reliability of such computerized evidence he should be given the opportunity to inquire into the procedures by which data is fed into and retrieved from the computer. *See United States v. De Georgia, supra,* 420 F.2d at 893, n. 11. We do not believe, however, that computer evidence is so

intrinsically unreliable as to make its introduction clear error.

Accordingly, the defendant's conviction is AFFIRMED.

GODBOLD, Circuit Judge (dissenting):

With deference, I must dissent. I think that admission into evidence of Exhibit 9–108, the computer printout, was reversible error.

The printout lists 139 agents and for each shows, among other data, what was identified as the current balance owed by him to the company. These are subtotalled for 14 agencies and totalled for the Fendley division (in the amount of $179,084.41).

The majority acknowledge that the requirements of the Business Records Act, 28 U.S.C. § 1732, were not met, but hold that the failure is to be overlooked because the defendant's objection was not sufficient.[1]

While the failure to lay a proper foundation is conceded, it is necessary to set out what occurred in order to understand the defense's objection, the sufficiency of it, and the policy reasons that are eroded by the majority's rationale that the objection was not sufficiently precise. The government offered no foundation testimony concerning the printout but simply asked the foundation witness if he could identify it, he said that he could, and it was offered in evidence. Previously the government had had the foundation witness lay a proper basis for introduction of three groups of documents from the business records of the insurance company, Exhibits 9–1 through 9–49, 9–50 through 9–65, and 9–66 through 9–107B. When Exhibit 9–108 was offered with no foundation evidence defense counsel conducted a voir dire. Following is that testimony:

---

**3.** We also note that Rule 803(6) of the new Federal Rules of Evidence which have now come into effect specifically provides that "data compilations" should be treated as any other record of regularly conducted activity.

**1.** In my view Exhibit 9–108 was devastating to the defendant. The majority do not stand on harmless error, despite a passing implication in footnote 2.

Q. [By defense counsel] Mr. Laughlin, with reference to Government's Exhibit 9–108, what is that instrument?

A. (Witness looks.) What is this?

Q. What do those—as with reference to Government's Exhibit 9–108—

A. I am sorry, I can't hear you.

Q. With reference to Government's Exhibit 9–108, would you tell us what those are—do you know what those are?

A. Yes, I do.

Q. All right. What is the terminology that you used in your company that you call those—what is the name of the instruments?

A. This is entitled "Balance forward for division 12865," a listing for the Fendley agency.

Q. Now, this is showing balances as of May 1, 1968?

A. (Witness looks.) That is correct. It shows the amount owed to the company by the agents in the general agency, and the total by division.

It lists—this is dated 5/1/68, and the accounting here would be as of the end of the preceding month, which would be April 30th, 1968.

Q. All right. Now, who prepared this instrument?

A. This is prepared by National Western Life Insurance Company.

Q. You are not an accountant, are you?

A. I am not operating in the capacity of an accountant at this time.

Q. Is that correct?

A. That is correct.

Q. That is not in your capacity with the company, is it?

A. My capacity was an accounting supervisor at one time with the company, yes.

Q. As to this, you did not supervise this preparation, though, did you?

A. Let me think. I will have to think a moment and get my chronology of the dates right in my mind.

(Pause)

Yes. At this time I was in charge of the Commission Accounting for the National Western Life Insurance Company.

Q. Did you prepare the figures for the Government's Exhibit 9–108?

A. (Witness looks.) I did not prepare them, no. They are prepared from computer records.

Q. So, you don't know and you can't tell us that—testify as to their accuracy, from your personal knowledge, in the preparation of them, is that right?

A. Well, yes, I can. I can, by relating them to the other statements that were prepared, showing these same balances.

Q. Well, what other statements did you use to determine the accuracy of these balances shown on Government's Exhibit 9–108?

A. Well, I have not compared these recently.

Q. Do you have them with you?

A. Do I have what?

Q. Do you have the work papers that you had with you?

A. I did not prepare work papers on them, no.

Q. So, you don't—

A. (Indicating) But, as to these, to the best of my recollection, I have checked in the past the current balances shown for each agent here against the commission account statements, which is a separate record.

Q. And who furnished that statement that you checked?

A. Those are also furnished from our computer records.

Q. So, you didn't prepare the statements which you used to compare these two?

A. No, sir. I did not prepare those statements, myself.

Q. So, you can't testify as to the accuracy of Government's Exhibit 9–108, can you?

A. I cannot say there would not be some error of some kind in a computer record, no, sir.

Defense counsel's objection, quoted in full by Judge Tuttle and again below, was overruled.

28 U.S.C. § 1732 requires that an entry be made in "regular course of business" and that it be in regular course of such business to make the entry at the time of the act (etc.) or within a reasonable time thereafter. In this case the only entrant or recorder revealed by the foregoing testimony is the computer. By its nature the computer records data coming from elsewhere. The classic case on regular course of business where the entrant or maker records information supplied by others is *Standard Oil Company of California v. Moore*, 251 F.2d 188 (CA9, 1957).

A memorandum or record cannot be considered as having been made in the "regular course" of business, within the meaning of § 1732, unless it was made by an authorized person, to record information known to him or supplied by another authorized person. The second paragraph of § 1732(a) expressly provides that the entrant or maker need not have personal knowledge of the matters recited in the memorandum or record. *Wheeler v. United States,* 93 U.S.App.D.C. 159, 211 F.2d 19, 23, certiorari denied 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140. *But where the entrant or maker records information supplied by others, it must appear that "it was part of their regular course of business to report to him what the declarants themselves knew, as it was part of his business to record what they said."* United*ed States v. Grayson,* 2 Cir., 166 F.2d 863, 869. *Where the information comes to the entrant or maker from unauthorized persons, the memorandum or record is therefore inadmissible, not because it contains hearsay, but because it was not made in the regular course of business.*

\* \* \* \* \* \*

A memorandum or record cannot be considered as having been made in the "regular course" of business, within the meaning of § 1732, unless it was made pursuant to established company procedures for the systematic or routine and timely making and preserving of company records.

\* \* \* \* \* \*

If there was any systematic or routine procedure being followed in the preparation and filing of such writings, the burden was upon appellee to prove it. He failed to do so, at least with regard to most such exhibits. Where this foundation was lacking, the exhibit was not admissible under § 1732.

*Id.* at 214–215 (footnotes omitted, emphasis added). See also footnote 34 at 215.

Section 1732 dispenses with the necessity of establishing reliability of recorded data by cumbersome testimony of numerous witnesses and substitutes the regular course of business requirements.

The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job 'or occupation. McCormick §§ 281, 286, 287; Laughlin, Business Entries and the Like, 46 Iowa L.Rev. 276 (1961).

28 U.S.C.A., Federal Rules of Evidence, Annotation to Rule 803, at p. 587.

What we know—and all we know—from the testimony quoted above that is even tangentially related to § 1732 inquiries is: (1) the insurance company uses a computer; (2) the computer printed this document; (3) the witness "supervised" the "preparation" of this document; (4) in the past the witness had checked current balances [either these or ones like these] shown on a printout against other computer records; (5) the witness could not say the printout was accurate.

Some of the things we do not know are these:

(a) The source[s] of the information consisting of the balance allegedly owed by each of the 139 agents in the Fendley division.

(b) Whether the [undisclosed] source[s] were authorized to receive the data and whether those sources "reported" it to the computer (or the person in charge of putting data into the computer) in the regular course of business.

(c) Whether the data was recorded by the computer (*i. e.*, put into its stored data) in the regular course of business and with the necessary degree of timeliness.

No explanation is tendered of why the government laid a § 1732 foundation for the three previous groups of exhibits but offered *none for the computer printout.* After defense counsel completed his voir dire and then objected, the government made no move to go forward with proof of the necessary elements. Of course, the government has the benefit of whatever proof had been elicited on voir dire. The comparison between that proof and the proper foundations laid in other computer evidence cases, relied upon by Judge Tuttle, is striking. In *U. S. v. Russo,* 480 F.2d 1228 (CA6, 1973), *cert. denied,* 414 U.S. 1157, 94 S.Ct. 915, 39 L.Ed.2d 109 (1974), the issue was the admissibility of the annual statistical computer run of Blue Shield of Michigan. In that case:

> The uncontradicted testimony of two witnesses established that the 1967 statistical run was a regularly maintained business record of Blue Shield and was made in the ordinary course of business. It was also shown that this record was relied upon by the company in conducting its business, particularly with reference to its auditing and actuarial procedures.
>
> \*    \*    \*    \*    \*    \*

Assuming that properly functioning computer equipment is used, once the reliability and trustworthiness of the information put into the computer has been established, the computer printouts should be received as evidence of the transactions covered by the input. No evidence was introduced which put in question the mechanical or electronic capabilities of the equipment and the reliability of its output was verified. The procedures *for testing the accuracy* and reliability of the information fed into the computer were detailed at great length by the witnesses. The district court correctly held that the trustworthiness of the information contained in the computer printout had been established.

*Id.* at 1239–40.

> The mechanics of input control to assure accuracy were detailed at great length as was the description of the nature of the information which went into the machine and upon which its printout was based.

*Id.* at 1241.

Similarly in *U. S. v. De Georgia,* 420 F.2d 889 (CA9, 1969), computerized records of Hertz Corporation were held properly admitted on a foundation consisting of showing the input procedures used, the tests for accuracy and reliability, and the fact that an established business relied on the computerized records in the ordinary course of carrying on its activities.

As the majority set out, we have recently pointed to three conditions that should be met to assure evidentiary trustworthiness of business records offered under § 1732. *U. S. v. Miller,* 500 F.2d 751, 754 (CA5, 1974). Not one of those requirements was met in this instance. First, the witness made no reference to any procedure, routine or otherwise, designed to assure the accuracy of these records. Second, he was silent as to the motive for maintaining the records. We can assume that an insurance company would want records like these, but judicial speculation by appellate judges is not what sound policy requires. So far as the evidence discloses, the agents' balances could have been calculated and cumulated for the purpose of this prosecution, which *Miller* precisely forbids. Third, we do not know whether the items are, or are not, "mere

accumulations of hearsay or uninformed opinions."

In the context of this case a computer is no different from a human recorder who receives information supplied by others and records it. This is not to say, whether information is received and recorded by a sophisticated electronic device, by a manually operated electric machine, or by a clerk holding a quill pen, that all data must be traced back to its original source in order to be admissible. The foundation witness can—just as the witness could have done in this case if the facts justified it—explain the business operations pursuant to which information is received by A in regular course of business, and in regular course of business passed on by him to B (who may be a computer or a person or a combination of them) who, timely and in regular course of business, makes a record.

Turning to the objection, the prosecution's failure should not be salvaged at the appellate level by the palliative that there was an insufficient objection. Especially is that so when the only foundation evidence produced was by the efforts of the defense. But I address myself to the majority's theory.

The objection was as follows:

Then, Your Honor, we will renew our objection to Government's Exhibit 9–108–B, [sic] on the basis that there is no accuracy shown that the instrument is accurate as to the figures it reflects;

And that the preparer was someone other than the witness here; that we cannot determine the accuracy of it and, therefore, it shouldn't be admitted;

Because it would be hearsay and, again, I cannot cross examine the paper, obviously, without having the party assigned to compiling the figures on it before us.

We object on that basis.

Judge Tuttle considers this to raise three grounds:

(1) that the document was hearsay;

(2) that the witness laying the foundation for its introduction was someone other than the preparer; and

(3) that the witness laying the foundation was unable to personally attest to the accuracy of the document.

This characterization seems to me to be unduly narrow.

The purpose of requiring objections and grounds is "to inform the trial judge of possible errors so that he may have an opportunity to reconsider his ruling and make any changes deemed advisable." *Fort Worth and Denver Railway Co. v. Harris*, 230 F.2d 680 (CA5, 1956). There can be no real doubt that all present and participating knew that the subject matter of the trial incidents that have been described was the question of whether the printout had been authenticated as required by the Business Records Act. Documents just introduced had been so authenticated and by the testimony of the same witness. When this exhibit was offered without any proffer of authentication evidence defense counsel conducted a voir dire and then objected.

Even a general objection may be sufficient "where the nature of the specific objection that could have been made was otherwise readily discernible by the court." 8A Moore's Federal Practice, § 51.02 p. 51–5. The objection in this instance was not the generalized "I object" nor the grounds the vague abracadabra of "incompetent, irrelevant and immaterial." There was no delay, no concealment of nonapparent grounds, no tactical plant of an innocent looking bomb to be exploded on appeal. It is disingenuous to treat this matter as though everyone has discovered for the first time on appeal, and to his surprise, the point which the defendant was seeking to call to the judge's attention. It raises from the grave in another form

the long-buried requirement of stating specific and tedious exceptions. In *Miles v. Texas Compensation Insurance Co.,* 220 F.2d 942 (CA5, 1955), only a generalized objection on the ground of immateriality was made to highly prejudicial testimony. This court, nevertheless, reversed, saying: "[I]n view of the grossly prejudicial character of the testimony, indulgence in subtle refinements of procedure to defeat appellant's right to have his wife's claim for compensation tried on its merits is not justified." *Id.* at 946. *See also, Hartford Accident & Indemnity Co. v. Bank of Commerce,* 170 F.2d 94, 95 (CA5, 1948).

Beyond the overall clarity of what the relevant trial events were all about, the wording of the objection, considered alone, does not permit the narrowing construction imposed by the majority. While not phrased with clinical precision, defense counsel's statements were necessarily directed primarily, if not solely, to the stage before data was put into the computer. The "party assigned to compiling the figures" was someone who worked with them before they went into the machine. No one "compiled the figures" after they came out of the machine. Counsel raised the fact that he had no way to test the accuracy, correctness or reliability—whatever the term one chooses—of the words and figures on the paper and that until there was some way for him to do so the paper was inadmissible. The majority's characterization of this as limited to the inability of the foundation witness to *say* that the figures were accurate disregards the objective of the Act which does not intend the interest of accuracy be met by someone's *saying* that what is written on the paper is correct—indeed that is what the Act is intended to make unnecessary.[2] Rather, as previously discussed, the inference of accuracy is drawn from proof of the business' regular use of the records of which the data is a part.

I must, and I do, dissent.

---

**2.** Parenthetically, the witness here was not even willing to make such a statement.