*661
 
 HATCHETT, Circuit Judge:
 

 Appellants, former customers of the bankrupt Arata & Co., appeal a district court judgment for the bankruptcy trustee, setting aside certain transfers of cash by the bankrupt to appellants within one year preceding the filing of a voluntary petition in bankruptcy. Appellants received cash transfers in excess of the total cash deposits they had made with the bankrupt. The district court found the transfers to be in violation of section 67(d) of the Bankruptcy Act. (11 U.S.C. § 107).
 
 [1]
 
 Central to the judgment for the bankruptcy trustee was the finding that each customer whose total cash withdrawal was less than his total cash deposit was a creditor within tire meaning of section 67(d)(1)(c). Because we hold that the transfers were in violation of section 67(d), that certain customers were creditors, and that a summary of computer records was properly admitted as business records, we affirm.
 

 FACTS
 

 The bankrupt, Robert L. Arata, operated a sole proprietorship known as Arata & Co., a purported commodities investments business. Over 900 customers invested $2,400,-000 with Arata & Co. The bankrupt’s customers entered into individual written contracts with the bankrupt, under which they made cash deposits for commodity investments; profits were to be divided between the bankrupt and the customers; the losses were to be borne by the customers alone. All of the cash deposits of the customers were placed in a single checking account and used by the bankrupt for investments, personal purposes, and business purposes unrelated to commodity investments. The bankrupt sent fictitious quarterly statements to all customers claiming to show specific commodity trades made on behalf of individual customers, profits and losses on those trades, additional cash deposits and cash withdrawals, if any, by the customers, and a balance for the individual customer. The balance was fictitious. No commodity trades were made in the name of any individual customer, and the quarterly statements were fictitious insofar as they purported to show that commodity trades were made in the name of individual customers.
 

 
 *662
 
 The bankrupt testified that he used a computer to make commodity trades based on a program he formulated with his background in computer programming. The bankrupt himself made all business decisions as to what commodities were bought and sold. He ceased commodities trading on December 7, 1973, when the S.E.C. directed him to stop trading. On January 24, 1974, he filed for bankruptcy. Subsequently, he pleaded guilty to violations of Texas securities laws.
 

 According to the district court, the bankrupt was insolvent, within the meaning of section 67(d) of the Bankruptcy Act at all times during the year immediately preceding the filing of his voluntary petition in bankruptcy. During this year preceding filing for bankruptcy, cash withdrawals were transferred to customers from the funds in the bank account. Some customers received no payments, others received payments less than their deposits, and some customers received cash payments in excess of their deposits. Appellants come from this latter group. The bankruptcy trustee, appellee Rosenberg, brought suit seeking to recover the excess received by the appellants in the year prior to bankruptcy. Of the ninety-two original cases, all were consolidated for trial.
 
 [2]
 
 At trial, the bankruptcy trustee attempted to show the financial condition of the bankrupt during the year preceding filing of the voluntary petition through the submission of, among other things, computer records. The trial judge admitted these records over the objection of appellants. The trial judge found that the transfers of cash withdrawals to each of the appellants in excess of their total cash deposits, respectively, were without fair consideration, and were transfers of property of the bankrupt within the meaning of section 67(d) of the Bankruptcy Act. The trial judge further found that each customer of the bankrupt whose total cash withdrawal was less than such customer’s total cash deposit was a creditor of the bankrupt under section 67(d).
 

 ISSUES
 

 Appellants contend that:
 

 (1) The trial judge erred in holding that the cash withdrawals received by each appellant within the one year preceding the filing of a voluntary petition which were in excess of each appellants’ cash deposits were transfers of property of the bankrupt within the meaning of section 67(d);
 

 (2) the trial judge erred in holding that each customer of the bankrupt whose total cash withdrawals were less than such customers’ total cash deposits was a creditor of the bankrupt within the meaning of section 67(d); and,
 

 (3) the trial judge erred in admitting into evidence, over the objection of appellants, computer records which were not properly authenticated as business records, without which there was a complete absence of any evidence to show that the bankrupt was insolvent at the time the transfers were made.
 

 DISCUSSION
 

 I
 

 Contending that there was no transfer of property within the meaning of the Bankruptcy Act, appellants claim that under section 67(d), the bankruptcy trustee only acquires the interest in the property of the bankrupt; that neither legal nor equitable title to the funds deposited by the customers passed to the bankrupt; that the language of the contractual agreement and the intent of the parties indicate either an express trust, a resulting trust, or a constructive trust relationship between the bankrupt and the customers. Therefore, appellants argue that no transfers of property can occur.
 

 We disagree. Appellants’ argument that the cash payments to them were not trans
 
 *663
 
 fers of property of the bankrupt under section 67(d) of the Act erroneously assumes that the bankrupt held the funds under either an express or implied trust. To succeed on their theory, appellants must first establish the existence of a trust under Texas law. 4 A
 
 Collier on Bankruptcy,
 
 the ¶ 70.25[1] (14th Ed. J. Moore 1975).
 

 Under Texas law, trusts are categorized as express, implied, and constructive.
 
 Mills v. Gray,
 
 147 Tex. 33, 210 S.W.2d 985 (1948).
 

 An express trust comes into existence only by the execution of an intention to create it.
 
 Mills v. Gray.
 
 The terms of the agreement between the bankrupt and his customers evidence no intent to create a trust. Rather, the terms of the agreement reveal an intent of the customers to purchase, on. a contingency basis, the bankrupt’s services as an expert in commodity trading. The agreement stipulated that profits would be shared, and losses would be absorbed by the customers. The bankrupt was solely responsible for all details of the operation, and all decisions as to what commodities were bought and sold were made by the bankrupt.
 

 The contract entered into by the bankrupt and his customers created, not an express trust, but an investment contract. Under Texas law, an investment contract is:
 

 a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter, or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.
 

 Clayton Brokerage Co. of St. Louis, Inc. v. Mouer,
 
 520 S.W.2d 802 at 806 (Tex.Civ.App.1975),
 
 dism’d as moot,
 
 531 S.W.2d 805 (Tex.1976). There, the court defined common enterprise as “one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties.”
 
 Id.
 
 at 807.
 

 Under Texas law, both resulting and constructive trusts are types of implied trusts.
 
 Mills v. Gray.
 
 Resulting trusts are created in circumstances not applicable here. “A resulting trust arises by operation of law when title is conveyed to one person but the purchase is paid by another.”
 
 Tolle v. Sawtelle,
 
 246 S.W.2d 916 at 919 (Tex.Civ.App.1952). Here, there is no dispute as to the ownership of property purchased with the funds in question.
 

 Under Texas law, a constructive trust may be created regardless of the intention of the parties where equity and justice demand. 57 Tex.Jur.2d, Trusts § 447 (1964). A constructive trust is usually found where property is acquired by fraud.
 
 Mills v. Gray.
 
 A constructive trust, however, can only attach to some identifiable property which can be traced back to the original property acquired by fraud.
 
 Meadows v. Bierschwale,
 
 516 S.W.2d 125 (Tex.1974).
 

 Further, even if a trust relationship was established, the inability of the customers of the bankrupt to trace their own property would defeat appellants’ assertion of a trust. To establish a trust relationship that excludes property from the bankruptcy estate, a claimant must: (1) prove the existence of the trust; and (2) trace the identity of his property.
 
 Schuyler v. Littlefield,
 
 232 U.S. 707, 34 S.Ct. 466, 58 L.Ed. 806 (1914); 4 A
 
 Collier on Bankruptcy,
 
 ¶ 7025[1] (14th Ed. J. Moore 1975). Under the present circumstances, none of the customers of the bankrupt could successfully trace his or her funds so as to sustain a claim for reclamation in the bankruptcy on a constructive trust theory because all of the funds from the 900 customers of the bankrupt were co-mingled in a single back account, which was used for personal and business purposes of the bankrupt, as well as commodity trading.
 

 Based on
 
 Cunningham v. Brown,
 
 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), appellants had the burden to trace and identify their funds.
 
 Cunningham v. Brown
 
 was a result of the then unique criminal scheme of the infamous Charles Ponzi. Ponzi se
 
 *664
 
 duced customers into loaning him money on the written promise that he would pay them, in ninety days, three dollars for every two dollars loaned to him. The funds were deposited in bank accounts, and Ponzi used these bank accounts to pay profits after ninety days. The profits were illusory, of course, being only the funds received from new customers. After Ponzi’s ingenious scheme collapsed, his bankruptcy trustee brought preference actions against those who were repaid only their original loan. These customers argued that they had only been repaid what was theirs. The court granted judgment to the bankruptcy trustee, stating that:
 

 . to succeed, they [Ponzi’s customers] must trace the money, and there- ' in they have failed. . . . There was, therefore, no money coming from them [the bank accounts] upon which a constructive trust, or an equitable lien could be fastened. . . . [Cases omitted.] In such a case, the defrauded lender becomes merely a creditor to the extent of his loss and a payment to him by the bankrupt within the prescribed period of four months [now one year] is a preference.
 

 265 U.S. at 11-12, 44 S.Ct. at 426.
 

 II
 

 We agree with the trial judge that the customers whose total cash withdrawals were less than their total cash deposits were
 
 creditors
 
 of the bankrupt.
 

 Under the Bankruptcy Act, a creditor is “a person in whose favor a debt exists.” § 67(d)(1)(c). The Act defines debt as “any legal liability, whether matured or unma-tured, liquidated or unliquidated, absolute, fixed, or contingent.” § 67(d)(1)(b).
 

 Accordingly, the customers were creditors if there existed a legal liability in their favor arising from their cash deposits. Under both the securities laws of the United States and Texas, a legal liability existed.
 

 The Securities Act of 1933, 15 U.S.C. § 771, provides that:
 

 Any person who—
 

 (1) offers or sells a security in violation of section 77e of this title . . . shall
 

 be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security ... or for damages.
 

 Section 77e(c) provides, in pertinent part, that “[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell . . . any security, unless a registration statement has been filed as to such security . . . .” Section 77b defines a security to be any
 
 investment contract.
 

 As defined by the Supreme Court, “an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.”
 
 SEC v. W. J. Howey Co.,
 
 328 U.S. 293 at 298-99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).
 

 This court has defined common enterprise to be “one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.”
 
 SEC v. Koscot Interplanetary, Inc.,
 
 497 F.2d 473 at 478 (5th Cir. 1974),
 
 citing SEC v. Glenn W. Turner Enterprises, Inc.,
 
 474 F.2d 476 (9th Cir.),
 
 cert. denied
 
 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).
 

 The evidence established the elements of “common enterprise” and “profits” to be earned solely by the efforts of the promoter. The customers’ fortunes were interwoven with and dependent upon the bankrupt’s efforts and success. The mails were used in connection with the contract agreement, and no registration statement was filed with the appropriate state and federal securities authorities. Thus, the bankrupt sold the security, an investment contract, to his customers, thereby violating the federal securities laws and creating á cause of action in his customers’ favor. The customers
 
 *665
 
 also have a claim against the bankrupt under the securities laws of Texas. The Texas Blue Sky Law gives the customers an identical cause of action and creates a liability flowing from the bankrupt to them. Art. 581 — 4, Tex.Rev.Civ.Stat.Ann. (1963).
 
 Clayton Brokerage Co. v. Mouer.
 
 Thus, the customers whose total cash withdrawals were less than their total cash deposits were creditors of the bankrupt within the meaning of section 67(d)(1)(c) of the Bankruptcy Act.
 

 Ill
 

 Appellants also contend that without the computer records and concept of customers as creditors, there was a complete lack of evidence as to the vital fact of insolvency; that the witness through whom the bankruptcy trustee sought to have the records admitted lacked competency to testify as to the reliability and trustworthiness of the documents and the functioning of the computer.
 

 The trial judge correctly admitted into evidence the summary of the bankrupt’s commodity trading activity. The admissibility of business records as an exception to the hearsay rule is determined by reference to Rule 803(6) of the Federal Rules of Evidence. Under Rule 803(6), computer data compilations may be business records themselves, and should be treated as any other record of regularly conducted activity.
 
 United States v. Fendley,
 
 522 F.2d 181 (5th Cir. 1975). This court has held that computer business records are admissible if three conditions are met:
 

 (1) The records must be kept pursuant to some routine
 
 procedure
 
 designed to assure their accuracy, (2) they must be created for
 
 motives
 
 that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and (3) they must not themselves be mere accumulations of hearsay or uninformed opinion.
 

 Fendley
 
 at 184,
 
 citing United States v. Miller,
 
 500 F.2d 751 (5th Cir. 1974),
 
 rev’d. on other grounds,
 
 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976).
 

 The trial court has broad discretion in ascertaining the admissibility of business records, and its ruling should be disturbed only when that discretion is abused.
 
 Fendley; Miller; United States v. Middlebrooks,
 
 431 F.2d 299 (5th Cir. 1970),
 
 cert. denied
 
 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971). Here, the trial judge admitted the summary of the records and evidence, implicitly finding that the business record requirements were met and that no circumstances existed to indicate a lack of trustworthiness in the monthly ledger account statements.
 

 The computer business records at issue here were prepared by Siegel Trading Co., at a time before this litigation was foreseeable, and were sufficiently trustworthy in the eyes of this disinterested company to be relied upon by the company in conducting its day to day business affairs. The comptroller for the company testified as the designated representative for the company regarding the documents. The comptroller’s testimony was sufficient to lay the proper predicate for the admission of the records. Appellants made no effort to raise any specific objections to the accuracy of the records when the comptroller made an earlier deposition. Any person in a position to attest to the authenticity of certain records is competent to lay the foundation for the admissibility of the records; he need not have been the preparer of the record, nor must he personally attest to the accuracy of the information contained in the records.
 
 Fendley.
 

 Even without the computer records summary, the record is replete with evidence of bad investments by the bankrupt with the money paid to him by his customers. The trial judge’s finding that the bankrupt was insolvent during the year pri- or to his bankruptcy was amply supported by the evidence in this case.
 

 CONCLUSION
 

 Thus, because we determine that the trial judge correctly found transfers of property under the Bankruptcy Act, correctly desig
 
 *666
 
 nated as creditors those customers whose total cash withdrawals were less than their total cash deposits, and correctly admitted into evidence the summary of the bankrupt’s commodity trading activity, we affirm.
 

 AFFIRMED.
 

 [1]
 

 . Section 67(d) of the 1898 Bankruptcy Act (11 U.S.C. § 107(d)), provides, in pertinent part:
 

 (d)(1) For the purposes of, and exclusively applicable to, this subdivision: (a) “Property” of a debtor shall include only his nonexempt property; (b) “debt” is any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent; (c) “creditor” is a person in whose favor a debt exists; (d) a person is “insolvent” when the present fair salable value of his property is less than the amount required to pay his debts; and to determine whether a partnership is insolvent, there shall be added to the partnership property the present fair salable value of the separate property of each general partner in excess of the amount required to pay his separate debts, and also the amount realizable on any unpaid subscription to the partnership of each limited partner; and (e) consideration given for the property or obligation of a debtor is “fair” (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied or (2) when such property or obligation is received in good faith to secure a present advance or antecé-dent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.
 

 (2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; or (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent; or (c) as to then existing and future creditors, if made or incurred without fair consideration by a debtor who intends to incur or believes that he will incur debts beyond his ability to pay as they mature; or (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors.
 

 [2]
 

 . All the actions were consolidated for discovery and trial, except that the trial judge ordered that defendant James Trautwein would receive a bifurcated and separate jury trial on the issue of no fair consideration. Trautwein’s appeal is in
 
 Rosenberg v. Trautwein,
 
 624 F.2d 666 (5th Cir., 1980).