In re J. Lynn JONES and Rebecca Jean Jones, d/b/a Union Exploration et al., Debtors.

In re UNITAS, INC., Debtor.

Robert B. WILSON, Trustee, Plaintiff,

v.

Gabe and Joann PARSON, J & A Lease and First National Bank, Evan Matlock, Bobbie Matlock, Ralph Payton, Ron Downing, J & A Lease and Gabe Parson, William E. Shields, Defendants.

Bankruptcy Nos. 583–00059, 583–00060. Adv. Nos. 584–5151, 584–5152, 584–5173, 584–5175, 584–5184, 584–5188, 584–5202 and 584–5221.

United States Bankruptcy Court, N.D. Texas, Lubbock Division.

Sept. 11, 1987.

542

Robert B. Wilson, Sims, Kidd, Hubbert & Wilson, Lubbock, Tex., trustee.

Gary Terrell, McWhorter, Cobb & Johnson, Lubbock, Tex., for investors.

### MEMORANDUM OF OPINION

JOHN C. AKARD, Bankruptcy Judge.

These Adversary Proceedings concern the Trustee-in-Bankruptcy's challenge to unrecorded assignments of interests in oil and gas leases.

### FACTS

J. Lynn Jones (Debtor) started brokering oil and gas leases in 1976. A pattern soon developed where he would acquire a lease in the name of Unitas, Inc., a wholly-owned corporation. It would then be assigned to J. Lynn Jones d/b/a Union Exploration with Unitas, Inc. retaining an overriding royalty. Then the Debtor would sell participations in the wells to be drilled upon the lease to various parties. During 1980, 1981 and 1982 the participations were sold to the Defendants in these Adversary Proceedings by the Debtor's salesmen.

The "Exploration and Drilling Agreement" dated February 14, 1980 "among UNION EXPLORATION, a sole proprietorship, solely owned by J. Lynn Jones, herein referred to as the Operator, and Gabe Parson, herein referred to as the Non-Operator," is typical of these assignments. For the sum of $23,000.00, Parson acquired a 10% interest in the initial well to be drilled on a designated oil and gas lease in Callahan County, Texas. The Agreement provided:

> For such sum of money, Operator shall, prior to the commencement of the initial well, assign to Non-Operator, by an Assignment in recordable form, an undivided 10% interest in the working interest evidenced by the lease insofar as the same applies to the 40 acre proration unit allocated to the initial well.

Parson received a first right of refusal to participate in additional wells on the property. The Debtor as Operator had exclusive charge, control and supervision of all operations on the lease and was authorized to enter into drilling agreements and other contracts for the benefit of the joint owners. Expenses were shared in relation to the ownership and the liability was several, "not joint or collective." Parson also received the right to take in kind and separately dispose of his proportionate share of the oil and/or gas produced from the wells, but in the event he did not do so the Operator was authorized to sell the oil and gas and account to Parson for the proceeds. The Agreement included a paragraph entitled "Risk Venture" in which the Non-Operators acknowledged that "the operations contemplated by this agreement constitute a high risk venture and they are relying solely upon their own judgment and not upon any statements or representations if any, which may have been made to them

by the Operator or any of the partners of Operator." Thus, Parson, along with the other Defendants, acquired what is known in the oil and gas industry as a non-operating working interest in the well.

Some of the Non-Operators recorded their Assignments, but others, including the Defendants in these Adversary Proceedings, did not. When Assignments were mailed to Non-Operators, they included no admonition that they should be recorded. The Debtor's secretary testified that when it became apparent that Assignments were not being recorded, the Debtor would record a group of Assignments before mailing them to the Non-Operators.

Initially, the Debtor did not maintain separate accounts on his books for each well. Funds received from Non-Operators were placed in the Debtor's general account and used as needed for overhead and drilling expenses with no attempt to match receipts to a particular well. If a well was successfully completed, and production commenced, then the Debtor would set up a special account for the well showing the interests of the various owners. Thereafter, receipts and disbursements were allocated to the particular well.

Apparently none of the Non-Operators exercised their right to take their share of production and sell it separately, so the Debtor, as the Operator, sold the production and distributed the proceeds.

The records of the Texas Railroad Commission (the agency which regulates oil and gas production in Texas) listed the Debtor as the Operator of each well. In addition to filing all the necessary reports with the Railroad Commission, the Debtor maintained a sign at the gate of each lease, on each well, and on each tank battery showing the Debtor as Operator. Frequently, the Debtor and his employees were on each lease performing the various functions necessary to operate and maintain the wells and equipment.

On February 18, 1983 an involuntary petition under § 303 of the Bankruptcy Code[1] was filed against the Debtor. The Debtor converted the case to a reorganization under Chapter 11 of the Bankruptcy Code on May 23, 1983. On March 28, 1984, the case was converted to a liquidation under Chapter 7 and Robert B. Wilson was appointed Trustee.[2]

## ISSUE

The issue before the Court is whether unrecorded oil and gas interests granted by a Debtor prior to bankruptcy are property of the bankruptcy estate, or property of the assignees.

## DISCUSSION

### Statutes

The Trustee asserts that he has title to the leases free and clear of any claims by the Investors under the provisions of § 544(a) which reads:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time,

---

1. The Bankruptcy Code is 11 U.S.C. § 101 *et seq.* References to section numbers are to sections in the Bankruptcy Code.

2. For convenience, the Defendants in these Adversary Proceedings will be referred to as Investors. They are included in the term Non-Operators, which term means all of the non-operating working interest owners in wells operated by the Debtor. The Debtor is referred to as Debtor or Operator.

whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

*Id.*

The Investors claim that they own an equitable interest in the leases while the Trustee holds bare legal title and thus the Investors' interests are not property of the bankruptcy estate pursuant to § 541(d). Section 541 defines the bankruptcy estate as follows:

(a) The commencement of a case ... creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

. . . . .

(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

### Which Law to Apply

The United States Supreme Court determined the relationship between state property laws and the equity powers of the bankruptcy court in *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The *Butner* Court found that bankruptcy courts should follow state property laws in most instances, regardless of countervailing claims of "equity." The Court stated:

... Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.... (Footnote omitted). Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interest should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy." (Citation omitted).

*Id.* at 54–55, 99 S.Ct. at 918. In *Butner,* the Supreme Court stressed the importance of state law to the decisions of bankruptcy courts. The *Butner* decision also clarified the Court's position on the proper place for the equity powers of bankruptcy courts stating:

The equity powers of the bankruptcy court play an important part in the administration of bankrupt estates in countless situations in which the judge is required to deal with particular, individualized problems. But undefined considerations of equity provide no basis for adoption of a uniform federal rule affording ... [a party] ... an automatic ... interest ... as soon as the ... [debtor] ... is declared bankrupt.

*Id.* at 55–56, 99 S.Ct. at 918.

Although *Butner* was decided while the Bankruptcy Act of 1898 was in effect, it "is still good law under the Bankruptcy Code of 1978." *Wolters Village, Ltd. v. Village Properties, Ltd. (In re Village Properties, Ltd.)* 723 F.2d 441, 443 (5th Cir.1984).

### Real Property

Under Texas law, an interest in an oil and gas lease is an interest in the minerals in the ground. Thus, it is real property.

*Phillips Petroleum Co. v. Adams,* 513 F.2d 355 (5th Cir.) *cert. denied* 423 U.S. 930, 96 S.Ct. 281, 46 L.Ed.2d 259 (1975) and *Onyx Refining Co. v. Evans Production Corp.,* 182 F.Supp. 253 (N.D.Tex.1959).

Article 6627 of the Texas Statutes requires that conveyances and mortgages of real property be recorded:

> All bargains, sales and other conveyances whatever, of any land, tenements and hereditaments, whether they may be made for passing any estate of freehold of inheritance or for a term of years ... and all deeds of trust and mortgages shall be void as to all creditors and subsequent purchasers for a valuable consideration without notice, unless they shall be acknowledged or proved and filed with the clerk, to be recorded as required by law; but the same as between the parties and their heirs, and as to all subsequent purchasers, with notice thereof or without valuable consideration, shall be valid and binding.

TEX.REV.CIV.STAT.ANN. art. 6627 (Vernon 1969).[3]

### Constructive Notice

Under § 544, the Trustee-in-Bankruptcy has both the rights of a judicial lien creditor and of a bona fide purchaser. In Texas, in order to be considered a bona fide purchaser, the claimant must show that he paid a valuable consideration, that he purchased in good faith and that he purchased without notice, either actual or constructive. *Strong v. Strong,* 128 Tex. 470, 98 S.W.2d 346 (Comm'n App.1936, opinion adopted).[4]

■ The term "knowledge" as employed in § 544(a) means actual notice, not constructive notice. *Gillman v. Preston Family Investment Co. (In re Richardson),* 23 B.R. 434, 439 (Bankr.D.Utah 1982) (stating that the term "notice" may include either actual or constructive notice, while the term "knowledge" includes only actual notice.) Thus, the choice of that term instead of the broader term "notice" indicated that Congress did not intend to shield the Trustee under § 544(a)(3) from the effect of constructive notice. *See Varon v. Trimble, Marshall & Goldman, P.C. (In re Euro-Swiss International Corp.),* 33 B.R. 872, 881 (Bankr.S.D.N.Y.1983). Therefore, the strong-arm powers of the Trustee under § 544 do not confer bona fide purchaser status on him if state law provides for constructive notice under the facts and circumstances of the case.

■ In applying § 544, the Trustee is presumed to purchase for a valuable consideration and in good faith. Since the transfers were made prior to the bankruptcy filing, the Trustee does not, at least in this instance, have actual notice. The remaining question is whether the Trustee had constructive notice.

Generally constructive notice is given by the proper recordation, pursuant to state law, of some document indicating the investor's interest in the property. In the instant case the parties stipulated that the assignments in question were not recorded.

The Investors argue that possession of the oil and gas leaseholds by the Debtor, as Operator, was sufficient to put the world on inquiry as to the Investors' interests. They point to the signs on the leases, wells and tank batteries, and the reports filed with the Texas Railroad Commission by the Debtor as indications that the Debtor was in open and notorious possession. Certainly the Debtor was: But does possession of an oil and gas lease by an operator give notice to the world of the rights of non-operating working interest owners? The Investors give two reasons why such possession gives constructive notice: first, be-

---

3. This statute was repealed by § 13.001 of the Texas Property Code on January 1, 1984. The Texas Property Code modernized the language but the substance remained the same. Former TEX.REV.CIV.STAT.ANN. art. 1289 contained similar language. It was also replaced by § 13.001 of the Texas Property Code.

4. The Commission referred to the Claimant as an "innocent purchaser," but the term is synonymous with the Bankruptcy Code concept of a "bona fide purchaser." The same rules are applied with respect to a lienholder. *Gough v. Home Owners' Loan Corp.,* 135 S.W.2d 771 (Tex. Civ.App.—El Paso 1939, writ dism'd judgmt cor.).

cause of custom in the oil and gas industry; second, because the Debtor is a co-tenant with the Investors.

### Custom in the Oil and Gas Industry

 The Investors argue that it is common knowledge that typically there are many working interest owners in an oil and gas lease and that anyone dealing with the operator should be aware of that fact. The Investors rely heavily on *Official Creditors' Committee of Partners Oil Company v. Partners Oil Company*, Adversary No. 83–2273–H3 (*In re Partners Oil Company*), No. 83–015787–H3–5, slip op. (Bankr.S.D.Tex. December 7, 1983).[5] Partners Oil Company was a Debtor-in-Possession in a Chapter 11 proceeding. The Creditors' Committee sought a preliminary injunction to prohibit Partners from distributing production runs to the owners of unrecorded working interests. The Court denied the injunction, thereby allowing the Debtor to continue the payments. The Court explained that the retention of legal title to oil and gas leases by the debtor-operator, even though equitable title is held by others, serves the following policies:

a. The efficient sale of production from wells;

b. The efficient policing of defaults by investors;

c. The avoidance of unnecessary filings should the well not prove commercially productive;

d. The ability of the operator to enter pooling and unitization agreements;

e. The efficient payment of taxes on the property;

f. The avoidance of delays in development until all leases are purchased.

The Court reasoned that Congress intended § 541(d) to apply to industries where substantial industry practice and good reason exists to warrant the retention of legal title by the debtor to operate the underlying real property for the benefit of the equitable title owners. The Court was careful to point out that its ruling was the result of a preliminary hearing and was made in the absence of developed case law on the interplay between § 541(d) and § 544(a).

This Court respectfully declines to follow the *Partners* rationale for the following reasons:

a. Most of the rationale given by the *Partners* Court relates to the operation of the properties. These operations can be handled just as easily by a well-drafted, recorded operating agreement. There is no need to hide the true ownership of the property from the world under the guise of operating efficiency. True, additional documents will be placed of record, but recording fees are minuscule compared to the cost of an oil well. The only persons inconvenienced would be abstracters and title examiners. They, being accustomed to reading reams of documents in an oil and gas title examination, would only be slightly bothered by additional documents.

b. Following the *Partners* rationale would lead to total uncertainty in the title to oil and gas leases in Texas. To what lengths would a prospective purchaser be forced to go before he could be sure he is a bona fide purchaser? Could he rely on a statement furnished by the seller? Must he personally examine all of the records in the seller's office? Must he search for owners by a newspaper advertisement? The problem is compounded where a judgment creditor seeks to levy on an interest in an oil and gas lease; certainly he could not expect cooperation from the debtor in order to examine the debtor's records. What if the debtor has negligently or fraudulently sold a greater interest in the well than he owns? The *Partners* rationale would require title investigation based upon rumor and hearsay, although the Texas Supreme

---

**5.** Baker and Leaverton, *Rights of Investors: With recorded interests, unrecorded interests and in limited partnerships,* 1984 Tex Bar Ass'n Advanced Bus.Bankr.Course at F–15 contains a good summary and commentary on the *Partners*

case. *See also,* Ray, *Unrecorded Assignments,* 23 Tex. Bar Ass'n Bulletin Sec.Corp., Banking and Bus.L. 21 (1986) and Ray, *Bankruptcy Trustees Target Unrecorded Interests,* 6 A.B.A.Bus. Lawyer Update 4 (1986).

Court has said that such an investigation is not required. *Strong, supra.*

c. Our research reveals no Texas case adopting the *Partners* rationale. Thus, we would have one rule for Texas oil and gas leases when administered by the state courts and a separate rule when administered by the bankruptcy courts. This is a result which *Butner* says must be avoided.

d. When customs of the trade conflict with state law, the law must prevail. The *Partners* ruling flies in the face of the Texas recording statutes. We are bound by *Butner*, to follow state law unless overriding federal policy directs otherwise. In this case, the Court has found no overriding federal policy with respect to oil and gas interests in Texas which would dictate its use, rather than that of existing state law.

### Possession by Co-Tenant

■ Under Texas law, the Debtor and the Investors, as owners of working interests, are co-tenants in the leases. *Shaw & Estes v. Texas Consolidated Oils*, 299 S.W.2d 307 (Tex.Civ.App.—Galveston 1957, writ ref'd n.r.e.). Possession by one co-tenant does not give notice of equitable rights as against another co-tenant. 16 Tex. Jur.3d, *Cotenancy and Joint Ownership* § 25 (1981). Previously, this Court held that possession of an oil and gas lease by an operator does not give notice of the lien contained in an unrecorded operating agreement in favor of the operator against the non-operating working interest owners who have not paid their share of the costs of drilling and production. *Wilson v. TXO Production Corp. (In re Wilson)*, 69 B.R. 960 (Bankr.N.D.Tex.1987). Additionally, it has been held that a sign placed on property by a real estate broker did not give notice that the broker claimed an interest in the property. *Teofan v. Cools (In re Spring Creek Investments of Dallas, N.V., Inc.)*, 71 B.R. 157 (Bankr.N.D.Tex.1987).

The Investors assert that possession of the leases by the Debtor as the Operator and co-tenant gives notice to the world of the interests of the other co-tenants. In support of their position, they cite *Collum v. Sanger Bros.*, 98 Tex. 162, 82 S.W. 459 (1904) and *Aldridge v. North East Independent School District*, 428 S.W.2d 447 (Tex.Civ.App.—San Antonio 1968, writ ref'd.). However, these cases involved a person buying or levying upon the interest of a co-tenant who was *not* in possession of the property. They stand for the proposition that when a person purchases from a co-tenant *not* in possession of the property, the purchaser must inquire of the person in possession as to the nature of that person's claim of title.

The *Strong* case, *supra*, points out the general rule that a purchaser must make inquiry as to the rights or title of the possessor of the property because possession is equivalent to registration in that it gives constructive notice of the possessor's rights. However, the *Strong* Court found no reason for imposing the additional burden on the purchaser to ascertain the common reputation in the community as to ownership of the land. "Reputation does not ordinarily afford a ready or dependable source of information. It has the fallibility of hearsay. Rights or titles to land should not be dependent upon the existence or nonexistence, the truth or the untruth, of common reputation, notoriety or rumor." *Strong*, 98 S.W.2d at 348. The record title to the property in question was in Manuel Strong. The Court found that the purchaser of an oil and gas lease was an innocent purchaser who could rely upon the record title in Mr. Strong and the possession of the property by Mr. Strong and his family against a challenge by children of his first wife who claimed an interest in the property.[6]

Where the purchaser deals with one who has both possession and record title and where a creditor secures a lien against a person who has both possession and record

---

6. It is interesting to note that Mr. Strong agreed that his first wife had a community interest in the property and that his children by the first marriage were entitled to that interest. He had not made this interest known at the time the lease was signed, so the Court upheld the lease against the challenge by the children of the first wife.

title, the holders of unrecorded interests in the property are cut off. *Triangle Supply Co. v. Fletcher*, 408 S.W.2d 765 (Tex.Civ. App.—Eastland 1966, writ ref'd n.r.e.); *Brown v. Federal Land Bank of Houston*, 180 S.W.2d 647 (Tex.Civ.App.—Fort Worth 1944, writ ref'd); *Gough, supra* at n. 4.; *Linthicum v. Greer*, 75 S.W.2d 315 (Tex. Civ.App.—El Paso 1934, writ dism'd); *Dallas Land & Loan Co. v. Sugg*, 237 S.W. 955 (Tex.Civ.App.—Austin 1922, writ ref'd). "It is a rule of general application that one who deals with land in the possession of another is chargeable with notice of all of the claims of the occupant which a proper inquiry would have disclosed ... but where possession is consistent with the record title, the possession is not notice of an unrecorded claim." *Linthicum, supra* at 316.

As early as 1883 the Texas Supreme Court noted the importance of proper recording of documents affecting land:

> That all persons who may deal with persons claiming land may have the means of knowing in whom titles to land rest, and that no one may buy what appears to be a good title, when another person may have better right not made public, the law requires all persons, for the protection of innocent purchasers and creditors, to register their titles to land.

*Eylar v. Eylar*, 60 Tex. 315 at 319 (1883). This stress on recording continues today. Recently the Fifth Circuit Court of Appeals, construing a Louisiana statute of the same ilk as the Texas statute cited above, held that title to an interest in an oil and gas lease was not perfected until the assignment was recorded. *Sandoz v. Bennett (In re Emerald Oil Co.)*, 807 F.2d 1234 (5th Cir.1987).

### *Section 544 versus Section 541(d)*

Section 544 gives the Trustee the rights of a bona fide purchaser and an attaching lien creditor (the strong-arm powers). These rights cut off most unrecorded interests and unperfected security interests. This section should be read in tandem with § 541(a), which defines property of the debtor's estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case." In turn, this subsection is limited by § 541(d) which provides that property in which the debtor has legal title, but no equitable interest, is property of the estate only to the extent of the debtor's legal title—not to the extent of any equitable interest the debtor does not hold.

The wording of § 541(d) as well as its legislative history discuss a mortgage servicing arrangement whereby the mortgage is sold by the debtor/servicer, who retains legal title to service the mortgage. The Fifth Circuit Court of Appeals considers this merely an example, and does not limit the application of § 541(d) to mortgage servicing only:

> As a general rule, it must be held that section 541(d) prevails over the trustee's strong-arm powers. Although those powers allow a trustee to assert rights that the debtor itself could not claim to property, Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own (footnote omitted). Where state law impresses property that a debtor holds with a constructive trust in favor or another, and the trust attaches prior to the petition date, the trust beneficiary normally may recover its equitable interest in the property through bankruptcy court proceedings (footnote omitted).

*Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1013–1014 (5th Cir.1985). *See also, Wisconsin v. Reese (In re Kennedy & Cohen, Inc.*, 612 F.2d 963 (5th Cir.1980), *cert. denied* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980).

Whether a constructive trust exists is a state law question. However, it becomes a federal question when one asks whether the trust attaches to general assets of the bankruptcy estate. Under federal law, the trust claimant must trace the funds which he supplied into specific assets of the estate or into a segregated account maintained by the Debtor or the trustee. *Id.*, at 966.

■ Texas law concerning constructive trusts is summarized in *Rosenberg v. Collins*, 624 F.2d 659 (5th Cir.1980) as follows:

Under Texas law, a constructive trust may be created regardless of the intention of the parties where equity and justice demand. A constructive trust is usually found where property is acquired by fraud. A constructive trust, however, can only attach to some identifiable property which can be traced back to the original property acquired by fraud. (Citations omitted).

*Id.* at 663.

In the instant case, the Investors did not assert fraud by the Debtor, so a constructive trust cannot be found on that basis.

■ Texas law also allows the imposition of a constructive trust where there is prior, unrelated history of close and trusted dealings of the same general nature or scope as the subject transactions and a finding of unjust enrichment. *Harris v. Sentry Title Co., Inc.*, 715 F.2d 941 (5th Cir.1983) (reviewing Texas cases). The Investors assert the fact that they turned over money to the Debtor when he requested it and relied on his expertise in the oil business was sufficient to create a fiduciary relationship between the Debtor and the Investors. This Court rejects that argument because the portion of the Exploration and Drilling Agreement quoted above specifically negates such reliance. Further, the transactions all occurred within a span of two years and the investments of the Investors generally related only to one well. Certainly this scenario was insufficient to create a prior, unrelated history of close and trusted dealings.

■ The Trustee argues that the Debtor commingled the funds. Thus, the Investors are unable to trace their funds into specific property. The Investors conceded this point by making no attempt to trace. The Investors assert, however, that the Drilling and Exploration Agreements provide a sufficient description of the property which they were acquiring. In some instances, in addition to the Drilling and Exploration Agreements, there are division orders, checks, or other documents identifying the property. In other instances, there are assignments which were unrecorded at the time the Debtor filed his bankruptcy petition. These documents seem to provide sufficient identification of the property for which the Investors paid. In a slightly different context, similar documentation was sufficient for a United States District Court in Louisiana to order the transfer of overriding royalties to former employees pursuant to an agreement entered into with their employer prior to the time the employer filed for bankruptcy. *Boyd v. Martin Exploration Co.*, 56 B.R. 776 (E.D.La.1986).[7]

A question identical to that at bar was presented to the Court in *D & F Petroleum v. Cascade Oil Co., Inc. (In re Cascade Oil Co., Inc.)*, 65 B.R. 35 (Bankr.D.Kan.1986). Under Kansas law, an interest in an oil and gas lease is real property and a bona fide purchaser takes free of any unrecorded conveyance. The Court said:

The trustee or as in this case the debtor-in-possession, pursuant to its status as bona fide purchaser under § 544(a)(3) is entitled to avoid the assignments to the "investors," Lonnie Kirkland and Pat Mercier, all of which were unrecorded on the date the petition for relief was filed.

*Id.* at 42. The same result was reached under the Bankruptcy Act:

The agreements for assignment of oil and gas interests were not recorded. After bankruptcy, the referee, in an order

---

7. The *Boyd* Court found that letter agreements were sufficient to transfer title between the parties and, thus, found a constructive trust resulting in the Debtor holding only legal title for the benefit of the former employees who had equitable title. The Court found that this equitable title was not part of the Debtor's estate pursuant to § 541(d) and ordered assignments made to the former employees. The Court did not consider § 544 because the attack on the assignments was mounted by the Unsecured Creditors Committee and the Court held that the Trustee was the only party authorized to bring an action under § 544. In finding that the agreement was valid between the parties, the Court quoted a Louisiana statute that is substantially the same as Article 6627 of the Texas Statutes cited above, but it did not discuss that statute in connection with the Trustee's position as a bona fide purchaser under § 544.

dated August 23, 1960, determined that the trustee was vested with title to the oil and gas leases free of all claims of the Hawaiian Investors under § 70(a)(5) of the Bankruptcy Act, 11 U.S.C. § 110(a)(5). The trustee thereafter administered those leases as the bankrupt's sole property.

*Hawaiian Investors v. Thorndal (In re Petroleum Corporation of America)*, 417 F.2d 929, 930 n. 1 (8th Cir.1969).

All of the cases which establish equitable title require either some wrongdoing or a breach of a fiduciary duty, leading to the imposition of a constructive trust.[8] Neither exists in this case. Assuming that the Exploration and Drilling Agreements, the unrecorded assignments and other documents create some equitable claim to the property in favor of the Investors, the equitable title asserted by the Investors directly conflicts with the Trustee's position as a bona fide purchaser or attaching lien creditor. Article 6627 of the Texas statutes specifically makes the unrecorded interests of the Investors void as to creditors and bona fide purchasers. In applying the maxim that "equity follows the law," equity will not impart validity to an instrument which is void at law. *Magnolia Petroleum Co. v. Railroad Commission of Texas*, 90 S.W.2d 659 (Tex.Civ.App.—Amarillo) *aff'd* 128 Tex. 189, 96 S.W.2d 273 (1936). Therefore, the Investors' equitable claims cannot withstand the challenge of the Trustee's superior legal claims.

### *Equity*

■ This is a court of equity. *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940). It is very tempting for a court of equity to recognize what it believes to be the rights of some parties and ignore the record ownership of the property. *Butner, supra* restrains this temptation. Further, under the facts of this case, granting equitable relief to the Investors is not justified.

It is a basic premise of equity that one does not resort to it when law provides an adequate remedy. "[W]here the parties have had a legal remedy and failed to use it, it is elementary and fundamental that no equitable relief may be granted." 34 Tex. Jur.3d *Equity* § 17 (1984). Here Texas law—the recording statutes—provided not only an adequate remedy, but a specific method for protecting the Investors' rights. The fact that they—and, indeed, the customs of the oil and gas industry—ignore the specific provisions of the statute designed to protect their interests, must deny them equitable relief. "[E]quity does not interfere with legal rights, even for the purpose of producing equality." *Id.*, at § 22. Indeed, "[t]he maxim that equity aids the diligent and not those who slumber on their rights is fundamental to equity jurisprudence and serves as the basis of the law of laches." (Citation omitted). *Id.*, at § 27.

While it is true that equity will not suffer a wrong to be without a remedy, the Investors still have one. As unsecured creditors they may file a claim in the bankruptcy proceeding to recover their losses. Although in most bankruptcy cases there is a relatively small distribution to the unsecured creditors, these Investors have the same rights as other unsecured creditors to share in what is available for distribution.

### CONCLUSION

The recording statutes provide certainty and stability to real property transactions. If these statutes are to serve their purpose, they must be observed. To validate the unrecorded interests of the Investors in this situation would be to open a Pandora's Box of never-ending litigation.

We are not dealing with a fiduciary relationship or a fraudulent transaction; we are dealing with a business transaction by which the Investors sought to participate in oil and gas operations. Whenever one entering into a business transaction fails to take the proper steps to protect his inter-

---

8. Except *Boyd, supra* which did not discuss the matter and assumed that the employees had equitable title and *Partners* which also assumed

without discussion that the Non-Operators had equitable title.

est—whether that failure is caused by ignorance, neglect or the failure to seek proper advice—that person must bear the result of his failure.[9]

The Court understands and sympathizes with the persons who invested money in this oil project who now find they do not get what they paid for. Some of them had never before been involved in an oil and gas investment. One stated that this was his "first and last" oil investment. It is always discomforting when two parties, perhaps friends, invest in the same project and one records his assignment and receives what he purchased while the other does not receive what he purchased because he did not record his assignment. This seems a harsh result,[10] but it is the result mandated by the recording Statutes of the State of Texas. *See Eylar, supra.*

The position of one who holds an unrecorded assignment is analogous to that of a "secured" party who did not perfect his security interest. On many occasions this Court has seen parties who thought they were secured suddenly find themselves unsecured because their security interest was not properly perfected by filing in the appropriate public office. When this occurs, there is no wailing and gnashing of teeth or outcry for equity. There should be none here merely because these Investors are individuals while most secured parties are large financial corporations (although sometimes the secured party is an individual); the rules of law apply equally to all.

These Investors now are in the position of those who provided services and materials to the Debtor. They had every right to expect that they would be paid in full, yet they now find themselves receiving only a small portion of their claim through the bankruptcy proceeding. If one weighs the equities, they would fall in favor of the suppliers of services and materials as opposed to the Investors who were, by their own admission, the risk-takers in these ventures.

Unfortunately, this decision does not put an end to the problems the Investors face. Each must now file a claim and establish the damages which he suffered by virtue of his dealings with the Debtor. The testimony indicated that some Investors had recovered through oil production only a small portion of their investment but others appear to have recovered as much as, and in some cases more than, what they had invested. The determination of these damages must be left for another day.

Order accordingly.[11]

## JUDGMENT

Robert B. Wilson, the Trustee-in-Bankruptcy for J. Lynn Jones and Rebecca Jean Jones and the Trustee-in-Bankruptcy for Unitas, Inc., filed the following Adversary Proceedings to resolve claims being made by the Defendants to oil and gas properties, the record title to which is in one or more of the Debtors:

| Adversary Proceeding No. | Defendants |
| --- | --- |
| 584–5151 | Gabe and JoAnn Parson |
| 584–5152 | J&A Lease and First National Bank |
| 584–5173 | Evan Matlock |
| 584–5175 | Bobbie Matlock |
| 584–5184 | Ralph Payton |
| 584–5188 | Ron Downing |
| 584–5202 | J&A Lease and Gabe Parson |
| 584–5221 | William E. Shields |

For the reasons stated in the Memorandum of Opinion of even date herewith, the

---

**9.** It has been my observation that many people entering into an investment transaction do not wish to understand that there are risks and possible losses; this is true even though they are furnished with a prospectus or other document which clearly explains the potential losses. When the activity turns out to be less profitable than they had expected, they attempt to shift the burden of their losses to someone else. Misplaced reliance on the seller of the investment contract is no excuse for an Investor's failure to properly perfect his interest.

**10.** The result is not nearly as harsh as the result in *Magnolia Petroleum Company, supra,* in which the Court required that two recently drilled wells be plugged.

**11.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052 which is made applicable to Contested Matters by Bankruptcy Rule 9014.

Court holds that the Trustee-in-Bankruptcy takes the property free of all claims of the Defendants which were not recorded on February 18, 1983, the date the bankruptcy petition was filed.

It is therefore ORDERED that:

1. Robert B. Wilson, Trustee-in-Bankruptcy, is hereby vested with title to all property standing in the name of J. Lynn Jones individually or d/b/a Union Exploration, Rebecca Jean Jones and/or Unitas, Inc. to oil and gas properties and leases on February 18, 1983, free and clear of any unrecorded claims or assignments of any nature whatsoever of each and all of the Defendants in these Adversary Proceedings.

2. Any documents recorded subsequent to February 18, 1983 tending to indicate title or a claim to title in any of the Defendants in oil and gas properties which on said date were standing in the names of J. Lynn Jones individually or d/b/a Union Exploration, Rebecca Jean Jones and/or Unitas, Inc. are hereby declared null and void and of no force, effect or virtue.

3. The Defendants shall have 60 days from the entry of this Judgment to file proofs of claim (or amend previously filed proofs of claim) as unsecured creditors in the captioned bankruptcy proceedings. Failure to file within said time shall constitute a bar to unfiled claims.