**In re I.D. CRAIG SERVICE CORPORATION, Debtor.**

**Joseph J. BERNSTEIN, Trustee, and Blue Cross of Western Pennsylvania and Pennsylvania Blue Shield, Movants,**

**v.**

**Roy C. and Trellice O. JONES, Respondents.**

**Bankruptcy No. 89–00640–JKF. Motion No. 89–5905–M.**

United States Bankruptcy Court, W.D. Pennsylvania.

April 12, 1991.

See also 118 B.R. 335.

**454**

Owen W. Katz, Bernstein & Bernstein, Pittsburgh, Pa., for Trustee.

Yaier Lehrer, Pittsburgh, Pa., for Roy C. and Trellice O. Jones.

Joseph Friedman, and Gerri L. Sperling, Pittsburgh, Pa., for Blue Cross and Blue Shield of Western Pennsylvania.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Bankruptcy Judge.

The matter before the Court is the Trustee's objection to the claim of Roy C. and Trellice O. Jones (the Joneses) in the amount of $339,000.00.[1] The Joneses, who seek the return of $339,000.00, are the parents of Harry G. Jones, I.D. Craig Service Corporation's (hereafter "Debtor") majority shareholder and president. Roy C. and Trellice O. Jones are insiders under the Bankruptcy Code by definition. 11 U.S.C. § 101(31)(B)(vi).

The evidence at trial established that Debtor's business involved selling memberships, the benefits of which included the right to purchase individual life, health and accident insurance at group rates. Debtor collected premiums from its members and paid the money over to the insurance companies. Harry Jones testified that from 1978 through 1988 Mr. and Mrs. Jones placed various sums of money "on deposit" with Debtor for the purpose of having Debtor include their money with Debtor's money for investment. According to Harry Jones, this procedure initially was intended to provide the Joneses with the higher rate of interest which banks return only to customers who place at least $100,000.00 on deposit.[2] The deposits, which eventually totalled the $339,000.00 at issue, were memorialized by internal corporate memoranda. The Joneses consented to the commingling of this money with Debtor's in an escrow account, which will be explained below, and into subsequent investments. From the escrow, Debtor regularly withdrew money and invested it in United States Government treasury instruments or certificates of deposit, without distin-

---

1. Roy Jones died while this matter was pending. Trellice is an heir. The funds at issue were theirs by the entireties.

2. Once the Joneses accumulated in excess of that amount they could have earned the higher

interest rates on their own even though they would have had the responsibility of tracking the progress of their investments and orchestrating reinvestments.

guishing the Joneses' contributions from its other funds. As investments matured, interest was collected by the Debtor. Principal was never paid over to the Joneses but was always reinvested along with Debtor's other funds.

Debtor sent the portion of the interest attributable to the Joneses' contribution to them with an explanatory note. Someone from Debtor's staff also would call the Joneses and explain the details to them. This process occupied two employees for one to one and one-half hours per week for more than ten years. During the three years prepetition, investments matured almost weekly and the same monitoring, processing and notification procedures were followed each time. The Joneses never paid a fee to Debtor or reimbursed any of its expenses, such as salaries or wages, stationery, postage, photocopy or telephone charges or overhead. By commingling their funds with Debtor's the Joneses were able to earn the higher rate of return which was made available to larger investors without the attendant monitoring and reinvestment responsibilities.

Debtor was a party to an escrow agreement with Mellon National Bank and Trust Company which established an escrow account "to segregate certain moneys received by [Debtor] in the course of its business of financing insurance policy premiums." The agreement also required Mellon to disburse the funds to Debtor upon written requisition. *See* Trustee Exhibit 2. Under Debtor's Articles of Incorporation and By–Laws, Debtor was not authorized to accept deposits for investment although it was authorized to, and did, invest money received in the ordinary course of its business. Furthermore, federal and state statutes provide penalties of fines and/or imprisonment for those who receive money for deposit in violation of those laws.

Specifically the federal banking laws provide that

(a) ... it shall be unlawful ... (2) For any person, firm, corporation, association, business trust or other similar organization to engage, to any extent whatever with others than his or its officers, agents or employees, in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor, unless such person, firm, corporation, association, business trust, or other similar organization (A) shall be incorporated under, and authorized to engage in such business by, the laws of the United States or of any State, Territory, or District, and subjected, by the laws of the United States, or of the State, Territory, or District wherein located, to examination and regulation, or (B) shall be permitted by the United States, any State, territory or district to engage in such business and shall be subjected by the laws of the United States, or such State, territory or district to examination and regulations or, (C) shall submit to periodic examination by the banking authority of the State, Territory or District where such business is carried on and shall make and publish periodic reports of its condition, exhibiting in detail its resources and liabilities, such examination and reports to be made and published at the same times and in the same manner and under the same conditions as required by the law of such State, Territory or District in the case of incorporated banking institutions engaged in such business in the same locality.

12 U.S.C. § 378(a)(2) (footnotes omitted). Under Pennsylvania state law:

No person may lawfully engage in this Commonwealth in the business of receiving money for deposit or transmission, or lawfully establish in this Commonwealth a place of business for such purpose, except a bank, a bank and trust company, a savings bank, a private bank, a savings association to the extent provided in the Savings Association Code of 1967, a regional thrift institution to the extent provided in section 117 of this act or section 114 of the Savings Association Code of 1967 and a person duly authorized by Federal law to engage in the business of receiving money for deposit or transmission. ...

7 P.S. § 105(a) (footnotes omitted). Neither Debtor nor anyone in Debtor's employ, including Harry Jones, was eligible to make investments for third parties under these laws. Nonetheless, the Joneses' funds were commingled with Debtor's funds, first in the escrow account and subsequently in the investments.

The Joneses contend that because internal corporate records of the Debtor identified the money as theirs and because their purpose in giving the money to Debtor was only to attain a better rate of interest, they continued to "own" the money. Although not stated in the pleadings it is apparent that the Joneses' claim relies upon some trust theory. However, the Court finds from the trial evidence and reasonable inferences therefrom that the funds are property of the estate and the Trustee's objection must be sustained.

■ In order to establish the existence of an express trust in Pennsylvania there must be proof that three elements exist: (1) an express intention to create a trust, (2) enforceable duties of a trustee, and (3) an identifiable beneficiary. 38 P.L.E. § 11 (1961) and 1990 Cum.Supp. *See also Presbytery of Beaver–Butler v. Middlesex,* 507 Pa. 255, 489 A.2d 1317, 1324 (1985), *cert. denied* 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985). There was no proof offered, either oral or written, of an express intention to create a trust and no trustee was named. Thus, there is no evidence of an express trust. Moreover, there was no proof offered that Debtor could have served as a Trustee for the purpose of investing funds of third parties. 12 U.S.C. § 378(a)(2); 7 P.S. § 105(a).

■ Pennsylvania also recognizes constructive trusts. Although a trust can be created by conduct, the conduct must be such that it admits of no other interpretation. *Presbytery of Beaver–Butler v. Middlesex,* 489 A.2d at 1324. Moreover, "[o]ne who seeks to construct a trust bears a heavy burden of proof; the evidence must be 'clear, direct, precise and convincing.' " *Roberson v. Davis,* 397 Pa.Super. 292, 580 A.2d 39, 41 (1990). For the reasons which follow, we find that there was insufficient evidence to prove that any of the necessary elements were met, and the evidence of record does not support a conclusion by clear and convincing evidence that a constructive trust was created.

■ The purpose of a constructive trust is to redress a wrong or prevent unjust enrichment where there exists fraud, accident, mistake, duress or undue influence. 38 P.L.E. at §§ 101, 102. *See also Roberson v. Davis,* 580 A.2d at 40–41. In the instant case no wrong was done to the Joneses by the Debtor—they were willing participants in an act which, as to the Debtor, was an illegal and ultra vires practice. The testimony established that Roy was an astute and experienced businessman. Harry Jones acknowledged Roy's business acumen and his familiarity with Debtor's financial affairs, including its undercapitalization and its frequent losses. Thus, the Joneses knew or should have known of the risk they were taking in commingling personal funds with corporate funds.

■ The Joneses have failed to prove by clear and convincing evidence that a constructive trust should be imposed for another reason as well. In order to support a claim for a constructive trust and to defeat the presumption that funds in a corporate account belong to the corporation, the claimant must be able to trace and identify its funds. *See Rosenberg v. Collins,* 624 F.2d 659 (5th Cir.1980). In *Rosenberg* Debtor's commodities investment customers could not trace their funds which had been commingled in an account used for business and personal purposes. *Id.* at 663. The court found that they had engaged in a common enterprise, *i.e.,* "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Id.* at 664. Debtor in the case at bench maintained a system whereby the funds were commingled not only in the physical sense through their deposit into a common escrow and their co-investment into a series of certificates of deposit or treasury bills, but in a bookkeeping sense as well. The fact that

Debtor kept internal records evidencing the Joneses' deposits, the existence of which were known only to insiders,[3] does not establish that the Joneses' claim to the money is allowable. Furthermore, Debtor always used the escrow funds to pay insurance premiums and occasionally borrowed from its escrow to meet operating expenses, using the commingled funds without segregating, in the documentary evidence of the transactions or otherwise, what Harry Jones characterized as "corporate" funds from other escrowed money. The Joneses threw in their lot with Debtor's and have not proven their claim that they retained ownership of the escrowed funds attributable to their investment.

In the case of *In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981), the court rejected an airline's claim that certain funds held by debtor, an airline ticket sales agency, were subject to a trust in the airline's favor, notwithstanding the fact that the agreement between them stated that debtor held the money in trust. The court based its conclusion on the fact that debtor was not required to keep its money in accounts separate from each airline's ticket money and had unrestricted use of all the funds in its possession. *Id.* at 1070. The court concluded that a debtor-creditor relationship existed and noted that even if the relationship was one of principal and agent, the claimant airline could not trace its money. The court stated that a claimant's burden is "to identify the property he seeks as his own, not just to exclude the possibility that it belongs to the debtor." *Id.* at 1074. In the instant case, the same analysis holds true. The escrow agreement itself established that only funds received by Debtor from its subscribers as policy premiums were to be deposited, and Debtor's use of the funds was unrestricted. The Joneses' money was commingled with Debtor's funds and could not be traced. We therefore conclude that no trust existed and that the $339,000.00 is property of the estate.

We also find there was no debtor-creditor relationship between the Joneses and Debtor. Rather, the Joneses' money constituted contributions to Debtor's capital. Harry Jones testified that he provided his parents with this "investment opportunity" because they lent money to the corporation early in its history to ensure its survival. He stated that the opportunity was open to "key employees," but admitted that Roy and Trellice were never employees of Debtor. By virtue of his initial loan of $25,000.00, which Debtor repaid many years ago, Roy knew that Debtor was undercapitalized inasmuch as the purpose of the loan was to enable Debtor to survive. Harry Jones also testified that Roy knew, through conversations with Harry over the years, that Debtor generally operated at a loss and that the daily profit/loss year-to-date statements that Harry received showed this. Roy frequently offered Harry business advice about the situation. Thus, the testimony supports the conclusion that the money was not "on deposit" and subject to the Joneses' claim of ownership, but rather was an investment in the corporation as a contribution to its capital. The Debtor corporation was not and could not be in the investment business and was not subject to the state and federal regulations which govern that business. *See* 12 U.S.C. § 378(a)(2); 7 P.S. § 105(a). The only "investment" anyone could make as to Debtor was an equity investment, whether or not evidence of the equity position was issued.[4] By contributing significant capital to Debtor and permitting it to remain in Debtor's account, we conclude that the Joneses acquired an equity position in Debtor by virtue of these transactions and that no debtor-creditor status existed or was intended between Debtor and the Joneses.

We acknowledge that, taken alone, the interest payments made to the Joneses as Debtor's investments matured could be

---

**3.** Harry Jones testified that even an accounting firm he had hired in the mid–1980s did not know that some of the escrow money was subject to nonbusiness claims.

**4.** Under Pennsylvania law a shareholder relationship can be created even in the absence of issuance of a stock certificate. *See, e.g., Krosnar v. Schmidt Krosnar McNaughton,* 282 Pa.Super. 526, 423 A.2d 370, 375 (1980).

construed as payments on a loan. However, there is no documentary evidence or testimony of a loan to Debtor by the Joneses. In fact, Harry Jones testified there was no intent to create a loan and neither Debtor's tax returns nor its other records reflect loans from the Joneses. Rather, Harry Jones testified that the Joneses put their money with Debtor's so that it could be invested at the higher interest rate, but he also stated that the Joneses kept their funds on deposit with Debtor even when the amount exceeded $100,000.00. Once that threshold was reached, the banks would have provided the Joneses with the higher interest rate without Debtor's intervention. Thus, in order to achieve their reputed goal of the higher interest rate, the Joneses had no need to commingle their money with Debtor's once it exceeded $100,000.00 but they continued to do so. Such an action establishes their intent to provide Debtor with a source of cash.

■ The filing of a proof of claim[5] constitutes prima facie evidence of the validity and the amount of the claim. Fed.R. Bankr.P. 3001(f). An objector has the burden of producing a preponderance of evidence of enough probative value to overcome the facial validity of the claim. The claimant thereafter must establish that he is entitled to payment, notwithstanding the objector's proof. *See* 11 U.S.C. § 502(a); Fed.R.Bankr.P. 3001(f); 3 COLLIER ON BANKRUPTCY ¶ 502.02 (15th ed. 1990). Taking the evidence as a whole, we find that the Trustee established that the monies deposited by the Joneses with Debtor represented contributions to its capital and are assets of this estate. The Joneses failed to overcome Trustee's proof, and the claim will be disallowed.[6]

An appropriate Order will be entered.

### ORDER

And now, to-wit, this 12 day of April, 1991, for the reasons set forth in the foregoing Memorandum Opinion, it is ORDERED that the Trustee's objection to the claim of Roy C. and Trellice O. Jones in the amount of $339,000.00 is sustained.

---

**5.** Roy and Trellice filed a proof of claim on August 11, 1989, while the case was in Chapter 11. No proof of claim was filed for them or on their behalf in the Chapter 7.

**6.** We need not reach the equitable subordination issue which was raised by the parties because of our findings that the facts established a contribution to capital and that no debtor-creditor relationship existed.